Joyce A. **RUTHERFORD**, Appellant

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration.**

No. 04–1779.

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 2004.

March 3, 2005.

Michael Patrick Boyle, (Argued), Philadelphia PA, for Appellant.

Donna L. Calvert, Regional Chief Counsel, Reg. III, Eric P. Kressman, Supervisory Attorney, Sandra Romagnole Gavin, (Argued), Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia PA, Patrick L. Meehan, United States Attorney, Joan K. Garner, Assistant United States Attorney, Eastern District of Pennsylvania, Philadelphia PA, for Appellee.

Before AMBRO and VAN ANTWERPEN, Circuit Judges and SHADUR, Senior District Judge.*

OPINION OF THE COURT

SHADUR, District Judge.

Joyce Rutherford ("Rutherford") challenges the denial of her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f ("Act").[1] She filed for benefits in June 2000, claiming an onset date of June 23, 1999 and an ongoing inability to work due to back and arm impairments. After an initial denial by the state agency, she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). Rutherford then appeared with counsel before ALJ William Reddy on June 11, 2001, and both Rutherford and a vocational expert testified. ALJ Reddy issued an opinion on August 31, 2001 that concluded that although Rutherford had impairments that qualified as severe, she was not entitled to benefits because she retained the residual functional capacity ("RFC") to perform existing jobs in the workforce and so did not meet the Act's definition of disability.

In response to a request for review, the Appeals Council issued a denial of reversal or remand on January 4, 2002, and the ALJ decision became the final decision of the Social Security Commissioner ("Commissioner") (Reg. §§ 1481 and 1400(a)(4)-(5); *Sims v. Apfel,* 530 U.S. 103, 106–07, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000)). Rutherford then exercised her rights under 42 U.S.C. § 405(g) to seek redress in the federal courts. On March 11, 2002 she

---

* Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. Further citations to the Act will take the form "Section—," eliminating any need to repeat "42 U.S.C." Relatedly, citations to the regulations in 20 C.F.R. pt. 416 will simply take the form "Reg. § —," citing the portion of the section number following "416." and thus omitting the repetition of "20 C.F.R." as well as "416."

filed a civil action in the United States District Court for the Eastern District of Pennsylvania, and both sides sought summary judgment. On January 22, 2004 the District Court granted summary judgment for the Commissioner. This appeal followed, and we affirm.

## Background

Rutherford was 48 years old at the time of her onset date. Although she attended school through the 11th grade, she was placed in special classes after sixth grade. In addition, current educational tests similarly reflect only marginal aptitude levels. Her employment history indicates experience as a private child care monitor and as an aide in a daycare facility. But she claims that her ability to work has been greatly reduced since a June 23, 1999 slip and fall at her grandchildren's school. Before the accident Rutherford was watching three children from her home and was earning about $100 per week. At the time of her administrative hearing, she testified that she was capable of watching only one child—her grandson—in addition to her own, activity that generated only a quarter of her previous earnings.[2]

After her fall Rutherford consulted with various doctors to assess her condition. In August 1999 an initial magnetic resonance imaging examination of her cervical spine revealed moderate degeneration of several vertebrae, significant enlargement of the left thyroid and minimal narrowing of the neural foramina on the right side. But that examination did not show any cord compression or signal abnormalities in either the cord or vertebral bodies. And an electromyogram and nerve conduction study performed in September 1999 showed normal results for her right upper extremity.

Following those initial exams, Rutherford consulted on several occasions with Dr. Jonathan Dissin, a cerebral vascular disease specialist. Dr. Dissin conducted neurological examinations and found that Rutherford could elevate her right arm only to the horizontal position, resulting in some diminished power in that arm. He did not observe any other abnormalities, with no problems in her gait, reflexes or sensations. Dr. Dissin prescribed various dosages of Neurontin and Tylenol–3 for pain control, and Rutherford participated in some physical therapy to address her pain as well.

In anticipation of her hearing Rutherford also visited a Rehabilitation Consultant, who prepared a vocational evaluation on her behalf. In addition to compiling past educational and employment information, that evaluation contained some information related to her physical condition. Most of that information was based on observations and interviews with Rutherford rather than medical records (which were not made available to the consultant), but the report did contain one piece of original physical information that is relevant here: the results of a Purdue Pegboard Test—designed to assess Rutherford's manual dexterity—that placed Rutherford's "hand speed at the lowest one percentile for all norm groups." Ultimately the evaluator concluded that Rutherford's educational level and physical conditions contributed to "significant vocational deficits."

Rutherford was questioned at her hearing by the ALJ and her counsel, and both focused primarily on Rutherford's alleged physical limitations. Rutherford identified

**2.** Rutherford had earlier told a vocational evaluator that she was still watching a seven-year-old child and was earning half of her previous income, but that disparity is not relevant to the present issues on appeal.

weakness in her right arm and pain in her lower back as impairments that contributed to an inability to work, and responded in the negative when asked directly by the ALJ whether any additional conditions deterred her from working. She also testified that her various prescribed medications were not alleviating her pain but were contributing to extreme drowsiness. Despite the fact that she continued to experience pain, she indicated that she could button buttons, work zippers and lift a gallon of milk (albeit with some difficulty on that last score). When the ALJ inquired about her use of a cane, Rutherford said that she needed it because of problems with her left leg, that it had been prescribed for her by a doctor treating a thyroid condition, and that she used it to steady herself while walking and standing (but not while ascending or descending stairs).

After Rutherford testified, the ALJ called upon Donald Millin ("Millin") to testify as an independent vocational expert. Millin first reviewed Rutherford's past vocational experience and characterized it as light in terms of exertion and semiskilled, with a specified vocational preparation classification of 3. He then responded to a number of hypothetical questions posed by the ALJ based on Rutherford's physical and educational limitations. Those responses assisted the ALJ in reaching his conclusion that although Rutherford's past work would be precluded, a number of other jobs existed in the economy that she could perform. Examples of jobs cited by the vocational expert include arcade attendant, apparel stock checker and—after being asked to factor in the need for a cane—lost-and-found clerk.

Under the Act an individual is disabled when "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months" (Section 1382c(a)(3)(A)). Section 1382c(a)(3)(B) provides additional details regarding the disability determination, and the Social Security Administration has promulgated regulations based on those provisions that set out a sequential five-step analysis to guide its analysis (Reg. § 920).[3] In the first four steps the burden is on the claimant to show that she (1) is not currently engaged in gainful employment because she (2) is suffering from a severe impairment (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her lacking the RFC to return to her previous employment (Reg. §§ 920(a) to (e)). If the claimant satisfies step 3, she is considered per se disabled. If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform (Reg. § 920(f)). Advisory testimony from a vocational expert is often sought by the ALJ for that purpose (*Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir.1999)), and factors to be considered include medical impairments, age, education, work experience and RFC (*id.;* Reg. § 920(f)).

Following the five-step analysis described above, the ALJ found that Rutherford did not meet the Act's definition of disability. Specifically the ALJ reached conclusions adverse to Rutherford's claim

---

3. Because the Reg. § 920 provisions are identical to those in 20 C.F.R. § 404.1520 covering social security disability benefits, we consider case law developed under both SSI and social security disability benefits law (*Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002)).

at steps 3 and 5 of the analysis. Although the ALJ found at step 1 that Rutherford had not been gainfully employed since she filed her application for benefits and at step 2 that she had severe impairments in her right upper extremity and lower back, he concluded at step 3 that Rutherford did not have impairments that would permit a showing of per se disability under Reg. § 920(d). And although the ALJ concluded that Rutherford could no longer perform her past relevant work at step 4, he determined at step 5 that she could perform a significant number of other jobs in the economy. In reaching those conclusions, the ALJ expressly credited the testimony of the vocational expert while discounting Rutherford's personal testimony on the grounds that it was "exaggerated and only fairly credible."

### Disability Analysis

 On appeal Rutherford raises both a general objection to the ALJ's analysis on the ground that it did not consider her obesity and some particular objections to the ALJ's step 5 determination. We have jurisdiction under both 28 U.S.C. § 1291 and 42 U.S.C. § 405(g) to review final determinations by the Commissioner, but the scope of our review is quite limited. Like the District Court, we must uphold a final agency determination unless we find that it is not supported by substantial evidence in the record (42 U.S.C. § 405(g); *Plummer*, 186 F.3d at 427). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (the often-repeated definition quoted, e.g., in *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir.2003)). It is "more than a mere scintilla but may be somewhat less than a pre-

ponderance of the evidence" (the standard quoted, e.g., in *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir.1971)). In the process of reviewing the record for substantial evidence, we may not "weigh the evidence or substitute [our own] conclusions for those of the fact-finder" (*Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir.1992)).

### 1. Consideration of Obesity

 Rutherford first argues that the ALJ erred by failing to consider her weight throughout the disability determination. Although Rutherford did not raise obesity as an impairment or limitation before the ALJ, she points out that the medical records available to the ALJ indicate her height of 5'2" and approximate weight of 245 pounds. And she correctly notes that the Commissioner has issued a ruling, Social Security Ruling ("SSR") 00–3p, that requires a consideration of obesity at various points in the five-step analysis.[4] From the combination of those factors, Rutherford contends that the ALJ was obligated to consider her obesity explicitly and that his failure to do so requires a remand. We disagree.

*Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir.2004)(per curiam) has recently considered the precise argument that Rutherford now asserts. In rejecting the notion "that the ALJ's failure to mention his obesity is reason enough to remand the case" (*id.* at 504), the Seventh Circuit articulated an analysis that might well have been written for this case (*id.*) (citations omitted):

An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. Although Skarbek did not specifically claim obesity as an impairment (either

---

4. SSR 00–3p has since been superseded by SSR 02–1p without any substantive changes. We rely here on SSR 00–3p because it was in

effect at the time of Rutherford's hearing, but we note that the analysis would be no different under the newer ruling.

in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. Despite this, any remand for explicit consideration of Skarbek's obesity would not affect the outcome of this case. Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity. Thus, although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.

We follow the Seventh Circuit and conclude that a remand is not required here because it would not affect the outcome of the case. Rutherford never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments. So even if we assume—in accordance with common sense—that the administrative record's evidence of Rutherford's 5'2" height and her weight of some 245 pounds sufficed to alert the ALJ that obesity could be a factor, Rutherford has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his

findings regarding her limitations and impairments.[5] Because her doctors must also be viewed as aware of Rutherford's obvious obesity, we find that the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition.[6]

## 2. RFC Determination

Rutherford next raises several objections related to the ALJ's conclusion at step 5 that she retained the limited functional capacity to perform jobs existing in the workforce. As is normally the case, that conclusion was based in large measure on the testimony provided by the vocational expert. Rutherford claims that such testimony cannot form the basis of a substantial evidence determination in her case because it was based on responses to hypothetical questions that did not adequately consider her physical limitations. In particular, Rutherford relies on language regarding the proper use of testimony by vocational experts in cases such as *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.1984) (citations omitted):

Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy. While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claim-

---

5. And none of that medical evidence mentions obesity as contributing to any limitation.

6. This conclusion also torpedoes Rutherford's contention that SSR 83–12 should have some

effect in her case, because that contention is premised on a finding that the ALJ erred by failing to consider her obesity.

ant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments. Thus the expert must have evaluated claimant's particular impairments as contained in the record.

We have elsewhere characterized the requirement in even stronger terms, warning that "a hypothetical question posed to a vocational expert must reflect *all* of a claimant's impairments" (*Burns*, 312 F.3d at 123)(quoting and adding emphasis to *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.1987)).

But the just-quoted language should not be misunderstood. We do not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant. Instead the directive in *Podedworny* is that the hypotheticals posed must "accurately portray" the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments "as contained in the record." *Burns* must also be read in that sense. Fairly understood, such references to *all* impairments encompass only those that are medically established (see, for example, Reg. § 929(b)).[7] And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations* (see *Plummer*, 186 F.3d at 431).[8]

Our cases have established some guidelines as to when a limitation is credibly established, and the governing regulations have something to say on that score as well (see especially Regs. §§ 945, 929(c) and 927). Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (*Burns*, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (*Plummer*, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible— the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993); Reg. § 929(c)(4)). Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it (Reg. § 929(c)(3)).

With this framework in mind, we turn to a consideration of the particular

---

7. Although the impairment must be medically determinable, it need not be a "severe" impairment to be considered in the RFC assessment (see Reg. § 945(a)(2)).

8. Because of this, objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself. That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety (like Rutherford's here) are really best understood as challenges to the RFC assessment itself.

limitations that Rutherford claims were improperly disregarded by the ALJ in his hypotheticals submitted to the vocational expert. Rutherford identifies four such limitations: extreme drowsiness caused by her medication, lack of manual dexterity, need to use a cane and need for a sit-stand option. We hold that all of those were reasonably discounted by the ALJ, so that the hypotheticals submitted to the vocational expert included all of the limitations credibly established by the record. As a result the ALJ was entitled to rely upon the vocational expert's responses as substantial evidence for his step 5 determination.

██ First, Rutherford points to numerous instances in her medical records indicating that drugs prescribed to her may have a side effect of drowsiness. Despite such evidence, the ALJ discounted Rutherford's claims in his RFC assessment and did not relay any hypothetical including drowsiness to the vocational expert because no actual complaint of drowsiness appears in the medical record and because the ALJ found severe drowsiness to be inconsistent with Rutherford's testimony that she cared for her child and grandchild. We have previously observed that "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations" (*Burns*, 312 F.3d at 131). No evidence of any functional limitation has been presented here. Accordingly we conclude that the ALJ's decision to discount the claimed side effects of drowsiness on the basis of their inconsistency with other record evidence was based on substantial evidence.

██ Next Rutherford relies on her Purdue Pegboard Test results—administered by a rehabilitation consultant as part of a vocational evaluation prepared on her behalf—to establish her claim that lack of manual dexterity should have been included as an impairment submitted to the vocational expert. While the ALJ acknowledged those results, he declined to include lack of dexterity as a limitation for purposes of the RFC determination because he found such a limitation to be inconsistent with Rutherford's testimony that she could button buttons and work zippers. Instead the ALJ took account of the extent of Rutherford's dexterity by including a hypothetical question regarding an individual capable of "not more than occasional handling and fingering with the right upper extremity."

That approach is consistent both with Reg. § 929(c)(4), which instructs the ALJ to evaluate claimed limitations in part based on "the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence," and with the consideration of a symptom as contemplated in the regulations, which require a reasonable relation between the symptom and a medically determinable impairment. Because we are satisfied that the ALJ considered the evidence and provided reasons for discounting Rutherford's claim of a general dexterity limitation, we find that the restricted dexterity hypothetical question submitted to the vocational expert adequately reflected Rutherford's credibly established limitation in that regard.

 final two arguments are also unavailing. For one thing, she provided no medical evidence to suggest her need for a sit-stand option or her use of a cane. Even so, she claims that the ALJ's failure to include those limitations is problematic because it is inconsistent with both Reg. § 929(c)(3) and SSR 96–7p, which instruct an ALJ that the mere lack of supporting objective medical evidence cannot form the basis for a decision to disregard a claimed symptom entirely.

Rutherford's assertion as to the sit-stand option fails in those terms because she never claimed the need for that option as a symptom of her back pain.

■ Although Rutherford did claim the need for a cane, she did so on the basis that it was necessary to address difficulties she was experiencing with her leg. But because no such leg impairment had been medically determined, the ALJ discounted Rutherford's claim on the basis that it was not a related symptom of an impairment. That approach is consistent with the regulations governing the RFC assessment. Just as importantly, Rutherford's argument is problematic because the ALJ actually considered her claimed need for a cane despite his concerns about the claim, both in an alternative hypothetical question submitted to the vocational expert and in his final decision. So the argument also fails because the claimed error did not affect the outcome of the analysis in any way.

*3. Conflicts between vocational expert testimony and the Dictionary of Occupation Titles*

Finally, Rutherford claims that the ALJ's step 5 determination is flawed even as to the physical limitations he did convey to the vocational expert. Specifically she contends that the ALJ should not be able to rely on the testimony provided by the vocational expert because that testimony was inconsistent in several respects with the information contained in the Dictionary of Occupational Titles—Revised (4th ed. 1991)("DOT") and because the ALJ did not inquire about those inconsistencies or explain why he chose to follow the testimony rather than the DOT. On the latter score, Rutherford relies on SSR 00–4p, which speaks to an affirmative duty on the part of an ALJ to inquire about conflicts between vocational expert testimony and the DOT. But for the reasons that follow, we

do not agree that the ALJ's reliance on the expert's testimony in this case requires a remand.

By its terms, SSR 00–4p, 2000 WL 1898704 (S.S.A. Dec. 4) was designed to address the already-well-established (in this Circuit and elsewhere) obligation of an ALJ to develop the record during an adjudicative hearing. As that ruling explains (id. at *2):

> When there is an apparent unresolved conflict between VE [vocational expert] or VS [vocational specialist] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

But if that SSR were to be read as establishing the outer boundary of an ALJ's "duty to fully develop the record," it would provide cold comfort for Rutherford. In its language dealing with "The Responsibility To Ask About Conflicts," the SSR states only this:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> > Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
> >
> > If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

In those limited terms Rutherford cannot look to SSR 00–4p as a source of relief. Although the vocational expert here did occasionally provide testimony that identified the jobs listed, only once did he "provide[ ] evidence about the requirements of a job or occupation." In other words, SSR 00–4p—by its literal terms—applies to only one limited portion of the vocational expert's testimony. And that portion alone does not establish any viable claim here, because that portion of the testimony described the requirements of Rutherford's past employment en route to testifying that she would not be able to return to that employment given her current impairments. If we were to exclude *that* testimony on the premise that the ALJ had failed to explore it further with the vocational expert, that would actually run counter to Rutherford's interest, for it would inappropriately open up the possibility that she could in fact have returned to her past employment, thus potentially defeating her claim at step 4.

But as stated earlier, before SSR 00–4p was promulgated we had already developed and applied a broader view of the ALJ's obligation to develop the record fully (see, e.g., *Boone v. Barnhart*, 353 F.3d 203, 208 n. 11 (3d Cir.2004) and cases cited there). That requirement is most critical in situations in which social security claimants are not represented by counsel and thus may not be capable of putting the best face on their claims, but it is equally applicable where lawyers are handling the case (as was true of Rutherford). We adhere to that view and hence consider the quoted SSR 00–4p directive to be exemplary, rather than exhaustive.

That being true, we continue to hold that inconsistencies between vocational expert testimony and DOT information may run afoul of that more general requirement—and may warrant reversal

as a result—even when they do not come within the literal obligation imposed by SSR 00–4p. Thus for example in *Boone*, which involved a hearing before SSR 00–4p was promulgated, we concluded that a remand was appropriate because the vocational expert's testimony was inconsistent with the DOT information and because no other substantial evidence existed in the record to support the ALJ's step 5 determination (353 F.3d at 206). At the same time, *Boone* also found that inconsistencies need not be fatal if substantial evidence exists in other portions of the record that can form an appropriate basis to support the result (*id.* at 209). And we followed that approach more recently in *Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir.2004), where we held that the inconsistencies there did not cause an ALJ determination at step 5 to be devoid of substantial evidence. We distinguished *Jones* from *Boone* by noting (1) that such inconsistencies did not exist as to *all* of the jobs identified by the vocational expert and (2) that the vocational expert testified that the three jobs he listed were simply examples, rather than an exhaustive list, of the work the claimant could perform given her limitations (*id.* and *id.* n. 6).

This case bears a closer resemblance to *Jones* than to *Boone*. First, the vocational expert here explicitly stated that other occupations would be available and that he was simply providing examples, so his testimony was not intended to provide a complete list of occupations available to an individual with Rutherford's limitations. Second, inconsistencies are not present as to each of the jobs that the expert did list. Many of Rutherford's claims are based on an assertion that the jobs listed by the vocational expert require greater dexterity than Rutherford possesses, as indicated by her Purdue Pegboard Test results. But those claims are really just a different

form of the already-rejected argument challenging the ALJ's decision to restrict Rutherford's dexterity limitation. And without that argument those claimed inconsistencies disappear, because the jobs identified are consistent with the limitations that the ALJ posed to the expert in his hypothetical questions. As for the other instances of claimed inconsistency, which relate to two jobs identified by the expert with specified vocational preparation classifications that render them beyond the ALJ's limitation to unskilled work, they are simply not egregious enough—either in number or in substance—to bring into question the ALJ's reliance on the expert testimony as a whole. Therefore, although some minor inconsistencies may exist between the vocational testimony and DOT information, we conclude that the testimony provided substantial evidence for the ALJ's conclusions.

### Conclusion

In sum, we find that the decision of the Commissioner was supported by substantial evidence. We AFFIRM the decision of the District Court.