**Edward J. O'NEILL, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security Administration, Defendant.**

**Civ. No. 12–1689.**

United States District Court, E.D. Pennsylvania.

May 6, 2013.

---

Thomas D. Sutton, Leventhal Sutton & Gornstein, Trevose, PA, for Plaintiff.

Alexander L. Cristaudo, Social Security Admin Office of General Counsel, Andrew C. Lynch, Philadelphia, PA, for Defendant.

### ORDER

PAUL S. DIAMOND, District Judge.

**AND NOW,** this 6th day of May, 2013, upon consideration of Plaintiff's Brief and Statement of Issues in Support of Request for Review (Doc. No. 14), Defendant's Response (Doc. No. 15), and Plaintiff's Reply (Doc. No. 18), and after Review of the Report and Recommendation of United States Magistrate Judge Thomas J. Rueter (Doc. No. 19), to which no objections have been filed, it is hereby **ORDERED** that:

1. The Report and Recommendation (Doc. No. 19) is **APPROVED** and **ADOPTED;**

2. Judgment is entered affirming the decision of the Commissioner of the Social Security Administration and the relief sought by Plaintiff is **DENIED;** and

3. The Clerk of Court shall mark this case closed for statistical purposes.

**AND IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

THOMAS J. RUETER, United States Magistrate Judge.

Plaintiff, Edward J. O'Neill, filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for Disability Insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act").

Plaintiff filed a Brief and Statement of Issues in Support of Request for Review ("Pl.'s Br.") and defendant filed a Response to Request for Review by Plaintiff ("Def.'s Br."). For the reasons set forth below, this court recommends that plaintiff's Request for Review be DENIED.

### I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for benefits on September 30, 2008, alleging disability be-

ginning on May 1, 2001. (R. 23, 177–82.) The claims were denied initially and a request for a hearing was timely filed. (R. 95–116.) A hearing was held on May 28, 2010 before Administrative Law Judge ("ALJ") Janice C. Volkman. (R. 38–89.) In a decision dated August 23, 2010, the ALJ found that plaintiff was not disabled under the Act. The ALJ made the following findings:

1. Claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2. Claimant has not engaged in substantial gainful activity since May 1, 2001, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. Claimant has the following severe impairment: low back pain (20 CFR 404.1520(c) and 416.920(c)).

4. Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6. Claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Claimant was born on June 19, 1969 and was 31 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because applying the Medical–Vocational Rules directly supports a finding of "not disabled," whether or not claimant has transferable job skills (*See* SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. Claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2001, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 25–32.) Plaintiff filed a request for review of the ALJ's decision. (R. 17–19.) The Appeals Council denied plaintiff's request, and the ALJ's decision became the final decision of the Commissioner. (R. 1–3.)

## II. *STANDARD OF REVIEW*

 The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's decision. *Jesurum v. Sec'y of United States Dep't of Health and Human Serv.,* 48 F.3d 114, 117 (3d Cir.1995). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28

L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence. *Jesurum*, 48 F.3d at 117. This court may not "weigh the evidence nor substitute its conclusions for those of the factfinder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924, 113 S.Ct. 1294, 122 L.Ed.2d 685 (1993). As the Third Circuit stated, "so long as an agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse ... those findings." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 (3d Cir.1986), *cert. denied*, 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 373 (1987).

To be eligible for benefits, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

■ Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment. 42 U.S.C. § 423(d)(5). A claimant satisfies this burden by showing an inability to return to former work. *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir.1979). Once this standard is met, the burden of proof shifts to the Commissioner to show that given the claimant's age, education, and work experience the claimant has the ability to perform specific jobs that exist in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f).

The Commissioner decided this matter by utilizing the five step sequential evaluation process established by the Department of Health and Human Services to determine whether a person is "disabled." This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of her age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920.

### III. BACKGROUND

#### A. Testimony of Plaintiff, May 28, 2010

At the administrative hearing plaintiff, accompanied by counsel, appeared and testified. (R. 43–75.) He was a forty years old high school graduate who last worked painting and detailing cars in a family business. (R. 42–44.) He stopped working approximately nine years prior to the hearing because back pain impeded his ability to perform the job. (R. 45.) He did not work after that time, but used proceeds from a lawsuit to pay his expenses.[1] After these funds were exhausted, plaintiff received financial assistance from his mother. (R. 46–47.)

Plaintiff was convicted of three "DUIs". After his third offense, plaintiff was incar-

1. Plaintiff was involved in a motor vehicle accident in 1998. He received approximately $210,000 pursuant to a settlement of a lawsuit filed as a result of the accident. (R. 46.)

cerated for three months in a Delaware County Prison in 2009.[2] (R. 48–49.) Plaintiff testified that although he was eligible to have his driving privileges reinstated, he did not do so because he was not comfortable driving. (R. 49.) Plaintiff initially stated that he stopped drinking in 2008 following rehabilitation treatment. *Id.* Plaintiff then indicated that the treatment occurred in 2004, was unsuccessful, and he resumed drinking. (R. 52.) He maintained that eventually, after several relapses, he stopped drinking.[3] (R. 49–54.)

In response to the inquiry from the ALJ as to the reasons he is unable to work, plaintiff replied:

> I cannot stand for too long on my feet. I—my back's cause me—I don't even sleep that well at night, I mean, I'm up at least three or four times a night with that pain, my numbness in my right leg, the shooting pain in my knee, and to try to get comfortable for my back. They— two cortisone shots on my back in the last couple of months and has not really done any help—I meant, it helped a little bit, but not to the severity with the pain doesn't go away. The pain's constantly there.

(R. 54.) Plaintiff added that he always experienced pain, but in the last five or six years it has gotten progressively worse.[4] (R. 55.) He was able to stand approximately ten or fifteen minutes, sit about the same amount of time, and walk about one and one-half blocks before the pain became uncomfortable. (R. 55–56.) He also experienced pain in his left heel and right calf. (R. 56.) Plaintiff estimated that he could lift approximately five pounds. *Id.*

Plaintiff initially stated that he was not currently receiving mental health treatment nor had he ever received mental health treatment. (R. 57.) The ALJ then pointed out that while incarcerated, plaintiff asked for mental health treatment. Plaintiff responded:

> I, well, when I—when I was sad in— when I was in there, I was just, I cannot believe I'm here and I'm going to have to be in here this whole time, and I just basically said to myself, "This is it. I should not be in this position in my life."

(R. 60.) He added that he was on Elavil, an anti-depressant, at one time to treat his depression. The ALJ pointed out that that Elavil was an "old drug" and therefore, plaintiff probably had not taken the medication for some time. Plaintiff responded: "I know, and that's why I couldn't—I stopped taking because it was making me really uncomfortable and dry mouth and all that when I couldn't—." (R. 59.)

With respect to his daily activities, plaintiff related that he usually stayed in his house because he was unable to concentrate because the pain is "constantly in my

---

**2.** Plaintiff was arrested for his third DUI in 2006, but did not begin his prison term until 2009. (R. 48.)

**3.** Plaintiff first asserted that he had not been drinking for two or three years. He then admitted that he had relapsed at times, but had been sober for at least one year. He opined that the reason he went back to drinking in the past was "Depression. A little bit, depression." (R. 73.)

**4.** Plaintiff experienced the worst pain in the lower left side of his back. This pain radiated down his leg and stopped at the knee. He also had pain in his left foot due to arthritis that was caused by surgery. (R. 69–70.) This surgery was performed in November 2001 after plaintiff fell down a flight of stairs while intoxicated. (R. 71.) The pain in his right leg radiated from his calf and caused numbness in the bottom of his foot. (R. 69.) Plaintiff explained that he had Nail–Patella Syndrome which affected his knee caps, ankles, elbows and shoulders. (R. 70–71.) Plaintiff was prescribed Lortab to treat his pain. (R. 68.)

head." (R. 57.) On a typical day, he rested during the day because he did not sleep at night. (R. 63.) He was unable to play sports. He had difficulty preparing meals due to his inability to stand, but he did prepare simple meals. (R. 57, 60.) He did not take public transportation but was driven to appointments by friends or family members. *Id.* He had a dog, but a friend helped him feed the dog. He did not need to walk the dog because the dog "gets tired." (R. 64.) Plaintiff did not use a computer "too much anymore" because his computer was outdated and he "can't sit there that long to sit there and mess with a computer, that's what I'm trying to say, and fiddle around with a computer."[5] (R. 65.) Plaintiff watched news, investigative shows and sporting events on television. (R. 66–67.) He read magazines on occasion. (R. 68) Finally, plaintiff related that he treated with his current physician, Dr. Eisner, for approximately six months. (R. 74.)

### B. Testimony of Clara Christine O'Neill, May 28, 2010

Clara Christine O'Neill, plaintiff's mother, did not recall why her son stopped working for his father.[6] (R. 76.) She acknowledged that she was providing financial assistance to plaintiff. She saw her son a few times per week, when she visited him at his home. *Id.* During these visits, she often observed her son sleeping, lying down or sitting on the sofa watching television. (R. 77.) Mrs. O'Neill opined that plaintiff would be unable to work at an office job on a full time basis. (R. 78.)

She explained that plaintiff experienced numbness in his foot, as well as back pain. (R. 79.) Mrs. O'Neill related that her son has gotten his drinking under control. She admitted that he had stopped drinking in the past, experienced relapses, and then stopped again. (R. 81–82.)

### C. Testimony of VE, Beth Kelly, May 28, 2010

The VE characterized plaintiff's past work as a painter of transportation equipment as skilled, medium work. However, it was considered heavy work as performed by plaintiff. (R. 83.) The ALJ posed the following hypothetical to the VE:

Okay. Let's assume an individual, a very younger [sic] individual in his early thirties—that's the alleged onset date of '01, . . . . Okay. Younger individual with a high school education and claimant's past work. And let's assume he could do light work that's simple one, two step. What jobs, if any, could he do?

(R. 84.) The VE identified jobs of housekeeper/cleaner, hand-packer and assembler as jobs the individual could perform. (R. 84–85.) The ALJ asked the VE to assume the same individual, but restricted his ability to performing simple, one-to-two step, sedentary work with a sit/stand option. (R. 85.) The VE opined that an individual with those limitations could perform the jobs of hand-packer, assembler and inspector. (R. 85–86.) Finally, the ALJ posed the following question to the VE:

---

**5.** Plaintiff testified that the last time he checked the email on his computer was approximately two months before the hearing. (R. 66.) He was able to check his email account and read the news but he did not shop, play games or go to chat rooms on the computer. *Id.*

**6.** However, in a letter dated May 24, 2007, Mrs. O'Neill wrote that her son complained about back and leg pain while working for his father. She added that these problems caused plaintiff to miss work, and plaintiff "would have confrontations with his father that eventually lead to his leaving O'Neill's Auto Body." (R. 708–09.)

Okay. Now I call your attention to Exhibit 20–B23F, which is Dr. Isner's [sic] medical opinion which, aside from other limitations, limits him to sitting, standing, and walking less than four hours in a normal workday. Let me make sure I've got that right. I think so. Stand and walk less than two, sit less than two. Can anybody work full time with those limitations?

(R. 86.) The VE indicated that an individual with those restrictions would be unable to work on a full time basis. *Id.* The VE concluded that if an individual would be off-task and needed to nap or rest several times a day he would have no ability to sustain work activity. (R. 87.)

## IV. *DISCUSSION*

Plaintiff avers, *inter alia,* that substantial evidence does not support the ALJ's ultimate conclusion that plaintiff was not disabled. (Pl.'s Br. at 4–16.) Specifically, plaintiff's request for review alleges that: (1) the ALJ erred in failing to find plaintiff's Fong's Disease and arthritis to be severe impairments; (2) the ALJ failed to assign the "greatest weight" to the opinions of plaintiff's treating physicians; and (3) the ALJ failed to present all of plaintiff's limitations to the VE. *Id.* Defendant contends that substantial evidence supports the opinion of the ALJ. (Def.'s Br. at 3–15.)

### A. *Severity of Plaintiff's Impairments*

Plaintiff initially argues that the ALJ should have found that his Fong's Disease,

or Nail-patella Syndrome,[7] and arthritis were severe impairments. (Pl.'s Br. at 4–8.) At step two of the sequential analysis, the ALJ must determine whether the claimant has a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

The Commissioner first must evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant does not have a severe medically determinable impairment, or *combination of impairments,* the ALJ will find the claimant not disabled at step two.[8] *Id.* (emphasis added). Regarding the proper analysis at step two, the Third Circuit has stated that the "burden placed on an applicant at step two is not an exacting one." *McCrea v. Comm'r of Soc. Sec.,* 370 F.3d 357, 360 (3d Cir.2004). An applicant need only demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Id.* (citing SSR 85–28, 1985 WL 56856, at *3). Reasonable doubts regarding the severity of the impairment are to be resolved in favor of the applicant. *Id.* (citing *Newell v. Comm'r of Soc. Sec.,* 347 F.3d 541, 546–47 (3d Cir.

---

7. Fong's Disease or Nail-patella Syndrome, is a "hereditary condition characterized by abnormally formed or absent nails and underdeveloped or absent kneecaps (patellae)." MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=4500 (last visited Apr. 8, 2013).

8. An impairment, or combination of impairments, is severe if it significantly limits the

claimant's ability to perform basic work activities, including, *inter alia,* understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b).

2003)). The Third Circuit has further clarified:

> Due to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny. We do not suggest, however, that a reviewing court should apply a more stringent standard of review in these cases. The Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence in the record as a whole. *See Williams v. Sullivan,* 970 F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."). Instead, we express only the common-sense position that because step two is to be rarely utilized as [a] basis for the denial of benefits, *see* SSR 85–28, 1995 WL 56856, at *4 ("Great care should be exercised in applying the not severe impairment concept."), its invocation is certain to raise a judicial eyebrow.

*Id.* at 360–61.

■ In the case *sub judice*, the ALJ did not screen out plaintiff's claim as "ground-less" at step two of the sequential evaluation. On the contrary, the ALJ found that plaintiff had a severe impairment, namely his back impairment, and continued with her sequential analysis. The ALJ ultimately found plaintiff not disabled at step five. Plaintiff adduces some evidence to support his claim that his impairments, Fong's Disease and arthritis, were severe.[9] The ALJ did find that these impairments were not severe. However, the ALJ did discuss these impairments in conjunction with plaintiff's other limitations. In addition, because the ALJ found in plaintiff's favor at step two, "even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless." *Salles v. Comm'r of Soc. Sec.,* 229 Fed.Appx. 140, 145 n. 2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart,* 399 F.3d 546, 553 (3d Cir. 2005)). For the foregoing reasons, this court finds that plaintiff's severity argument is without merit.

### B. *ALJ's Consideration of Evidence*

■ Plaintiff also argues that the ALJ failed to properly credit the medical opinions in the record to support her RFC

---

9. Plaintiff cites to results of an MRI and x-rays as evidence that these impairments were severe. (Pl.'s Br. at 7.) However, these test results refer primarily to plaintiff's back impairment and in her decision the ALJ found that plaintiff's lower back condition was severe; any failure of the ALJ to refer to these was harmless. As stated above, the ALJ did not stop her analysis at step two. She considered plaintiff's severe impairment in conjunction with his other impairments. (R. 25–32.) Moreover, the MRI of plaintiff's right knee taken on February 15, 2001 referenced by plaintiff showed normal meniscus, cartilage and subchondral marrow in both the medial and lateral compartments, normal quadriceps and patellar tendons, normal anterior and posterior cruciate ligaments, an intact medial collateral ligament, along with normal iliotibial band, lateral collateral ligament and biceps femoris. (R. 384–85.) The results indicate any dysplastic patellofemoral articulation was "mild." *Id.* In addition, as herein stated, the ALJ considered the report of Alfonso Cuozzo, M.D., wherein the physician indicated that plaintiff reported achy knees and shoulders and that plaintiff maintained that his Nail-patella Syndrome caused intermittent pain and discomfort. (R. 29, 322.) The ALJ further acknowledged that plaintiff had been diagnosed with "minor" tendonitis/bursitis of his right shoulder in 2009. (R. 29, 324.) Finally, records also show that plaintiff experienced a knee injury in a car accident. Physicians' notes reveal that plaintiff consistently had normal range of motion, only intermittent knee dislocation that did not warrant surgery, only sporadic knee aches and no difficulty walking. (R. 324, 426, 428–29, 437, 453.)

assessment. (Pl.'s Br. at 8–15.) Specifically, plaintiff maintains that the ALJ erred when she failed to assign the "greatest weight" to the opinions of plaintiff's treating physicians, Joel Eisner, M.D., and Kyle Forsyth, M.D. "without an adequate explanation." (Pl.'s Br. at 8.) Plaintiff avers that the ALJ should have accepted the limitations identified by these physicians and urges that these limitations would preclude him from performing any sustained work.[10] (Pl.'s Br. at 10–12; R. 431–33, 611–12.)

RFC refers to the most a claimant can do despite his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment must be based upon all relevant evidence, including medical records, medical source opinions, and a claimant's description of his own symptoms. In addition, the final responsibility for determining a claimant's RFC is reserved exclusively for the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Moreover, the weight afforded to a medical opinion is dependent upon a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. §§ 404.1527, 416.927.

After considering the record, the ALJ opined that plaintiff had the RFC to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), which requires the ability to lift no more than twenty pounds with frequent lifting or carrying of up to ten pounds. (R. 26.) An individual capable of performing light work also must be able to do a good deal of walking or standing, or when sitting, must be capable of pushing and pulling arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b). The ALJ reviewed the evidence of record and determined that it did not support any functional limitations that would preclude performance of these activities. *Id.* Plaintiff is correct that the ALJ ultimately concluded that the opinions of Drs. Eisner and Forsyth were not credible. (R. 30.) However, that occurred only after she provided an extensive recitation of the medical evidence in this case.

As stated above, Drs. Eisner and Forsyth provided little or no information to support their conclusions regarding plaintiff's limitations. (R. 432–33, 611–12.) After reviewing the medical evidence of record, the ALJ adopted the opinion of Dr. Cuozzo, a physician who examined plaintiff in June 2009. Dr. Cuozzo determined that plaintiff could lift and carry twenty-five and fifty pounds occasionally, stand and

---

**10.** In a "Medical Opinion Re: Ability to Do Work–Related Activities (Physical)," Dr. Forsyth indicated that plaintiff could lift and carry less than ten pounds, stand and walk less than two hours during an eight-hour work day, sit less than two hours during an eight-hour work day, and required the opportunity to lie down at unpredictable intervals throughout the day. (R. 611–12.) Dr. Forsyth further indicated that plaintiff could never climb ladders or stairs, stoop, crouch or twist and had limitations in reaching and handling. In the space provided requesting the physician to list medical findings to support those limitations, Dr. Forsyth provided no information. (R. 612.) Dr. Eisner report-

ed that plaintiff could stand, walk and sit less than two hours in an eight-hour day, must change positions every ten minutes, needed the opportunity to shift at will from sitting or standing/walking and needed to lie down at unpredictable intervals several times per day. (R. 431–32.) Dr. Eisner listed the medical findings to support the limitations as "continued spinal stenosis." (R. 432.) Dr. Eisner wrote no explanation as to why plaintiff was unable to reach, push or pull. Similarly, when asked to provide evidence of impairments such as the need to use an assistive device for ambulation, need to elevate legs, etc., Dr. Eisner provided no explanation. (R. 433.)

walk for six or more hours in an eight-hour workday, had no limitations on sitting, pushing and pulling, reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting, smelling or with continence. (R. 320–21.) Dr. Cuozzo also found that plaintiff occasionally could bend, kneel, stoop, crouch, balance and climb. *Id.*

The physician ultimately concluded that plaintiff had no debilitating impairments. *Id.* Dr. Cuozzo diagnosed plaintiff with mild degenerative joint disorder in his right shoulder along with some tendinitis/bursitis and intermittent knee aches. (R. 324.) He further found that plaintiff had 20/20 vision in each eye, and normal central nervous system responses. (R. 325.) Upon examination, plaintiff's range of motion for his cervical spine was thirty-five degrees on a scale of one to forty; thirty out of a maximum of thirty for his neck flexion; twenty-five degrees out of thirty for neck extension; and forty-five degrees out of forty-five for his cervical rotation. (R. 319.) His range of motion for his lumbar spine was eighty-five to ninety degrees and extension out of a maximum of ninety degrees; and fifteen degrees right and left lateral flexion out of a maximum of twenty. *Id.*

Other medical evidence of record support the ALJ's ultimate RFC conclusion. Following plaintiff's automobile accident in 1999, Gary Lindebaum, M.D., found plaintiff's lumbar spine exhibited bilateral spondylosis of L5 with grade one spondylolisthesis, the least advanced form. (R. 632.) Dr. Lindebaum reported that with the exception of some degenerative changes in the facet joints, plaintiff's "vertebral bodies are otherwise intact in a normal position and alignment," and his disc spaces were normal width.[11] *Id.* In October 2001,

after plaintiff's alleged onset date, Benjamin Auerbach, D.O., found that plaintiff had no muscle atrophy and had 5/5 motor strength in his upper extremities. The physician noted some narrowing of the disc space and recommended physical therapy. (R. 24, 30, 421–22.)

In January 2004, plaintiff treated with Kevin A. Mansmann, M.D., for complaints of lower back pain. (R. 29, 679.) Dr. Mansmann also diagnosed plaintiff with L5–S1 grade one spondylolisthesis, which had not worsened since the 1999 diagnosis of Dr. Lindebaum. (R. 679.) The physician also indicated that plaintiff had eighty-five percent range of motion in his lumbosacral spine. *Id.* In 2004, plaintiff sought treatment at the Malvern Institute for alcohol, marijuana and cocaine abuse. (R. 29, 685.) While a patient there, plaintiff denied a history of chronic pain. (R. 695.) A physical examination revealed that plaintiff had full range of motion in his neck and extremities, full flexion and extension in his back, normal back alignment and a normal gait. (R. 701–02.)

George Steele, M.D., treated plaintiff for recurrent knee and back pain in 2005. (R. 264.) Dr. Steele found that plaintiff was negative for neck pain, weakness, numbness or tingling of his hands and feet, had no joint crepitance, and had 5/5 strength in all of his extremities. (R. 265.) In 2007, Steven Ebner, M.D., treated plaintiff and found no evidence of compression fracture in his spine. The physician noted that plaintiff's disc spaces were well maintained, his pedicles and transverse processes appeared intact, and his sacroiliac joints and sacral neural foramina were symmetrical. He did note a mild degener-

---

11. As noted by the ALJ, during this period, plaintiff was still working in his father's shop as a car painter. (R. 30.)

ative change in plaintiff's shoulder tendinitis. (R. 250–252.)

Steven R. Myrick, M.D., treated plaintiff in 2008 for an umbilical hernia. At that time, plaintiff informed Dr. Myrick that aside from a previous foot injury, he had no other health problems.[12] (R. 29, 425.) The physician indicated that with the exception of the hernia, plaintiff had no other health problems. *Id.* In 2009, Stuart Brilliant, M.D., saw plaintiff for complaints of pain and paresthesia. (R. 428.) Plaintiff reported that he had no numbness, weakness, or difficulty walking and described his "maximum deficit" as "moderate." *Id.* Plaintiff reported some lower lumbar tenderness, but his examination revealed a normal neck, normal range of motion in his extremities, and a normal gait. Dr. Brilliant surmised that plaintiff's symptoms may have been attributable to a pinched nerve, and prescribed medication. (R. 29–30, 429, 467.)

Plaintiff went to Paoli Memorial Hospital in January 2010 complaining of severe pain. However, during his examination, plaintiff exhibited normal range of motion of his extremities, no back tenderness, no vertebral point tenderness, and ambulated well about the room. (R. 453.) Plaintiff was discharged with a prescription for Ibuprofen. (R. 454.) Later that month, plaintiff again visited the hospital. The treating physician once again noted that plaintiff had a normal neck, normal range of motion in his extremities and back, and a normal gait. (R. 437.) Andrea Horvath, M.D., concluded that plaintiff did not have spinal cord compression. (R. 438.) Jean Yi, M.D., reviewed plaintiff's radiology report and noted that plaintiff had mild to moderate spondylolisthesis, minimal scoliosis and minimal endplate osteophytes in the lumbar spine. (R. 443.) In February

2010, plaintiff received an injection that significantly improved his symptoms. (R. 30, 541.)

The ALJ analyzed the medical evidence of record and ultimately concluded that plaintiff's claims concerning the limiting effects of his symptoms were not credible to the extent they conflicted with the objective evidence. The ALJ related that plaintiff was found "neurologically intact," and had no evidence of disc herniation or nerve root impingement. She added that plaintiff has not had surgery, was never advised that he was a surgical candidate, and has not participated in a pain management program. The ALJ further noted that plaintiff's treatment has been conservative in nature with medication and physical therapy. Finally, the ALJ reported that despite claims of debilitating pain, plaintiff and his mother both testified that he generally was able to take care of his personal needs, do light household chores, shop, and socialize with family members. Plaintiff also watched television, used a computer, and read magazines. (R. 30, 221–23.)

Contrary to plaintiff's assertion, the ALJ, properly assessed plaintiff's RFC after considering the record as a whole, including the medical records, medical source opinions, plaintiff's subjective complaints and description of his daily activities. 20 C.F.R. §§ 404.1545, · 416.945. Thus, this court concludes that plaintiff's argument regarding the ALJ's assessment of the medical evidence is without merit.

#### C. *ALJ's Hypothetical to the VE*

██ Finally, plaintiff argues that when questioning the VE about whether plaintiff could perform other work pursuant to step five of the sequential evaluation

---

**12.** The record shows that plaintiff suffered a left calcaneus fracture after falling down stairs while intoxicated in December 2001. (R. 28, 284–85.)

process, the ALJ failed to include limitations set forth by Dr. Eisner. (Pl.'s Br. at 15–16.) The law with respect to the hypothetical question is well-established. Third Circuit precedent holds that the "hypothetical question posed to a [VE] 'must reflect all of a claimant's impairments.'" *Burns v. Barnhart,* 312 F.3d 113, 123 (3d Cir.2002) (quoting *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir. 1987)). The hypothetical question must reflect a plaintiff's *credibly established* limitations. Courts do not require that an ALJ submit every alleged impairment to a VE. *Rutherford v. Barnhart,* 399 F.3d 546, 553–54 (3d Cir.2005) (emphasis added). Furthermore, the VE's testimony with regard to "a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question [posed to the VE] accurately portrays the claimant's individual physical and mental impairments." *Burns,* 312 F.3d at 123 (quoting *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984)). *See also Allen v. Barnhart,* 417 F.3d 396, 407 (3d Cir.2005) (same); *Rutherford,* 399 F.3d at 554 (same); *Ramirez v. Barnhart,* 372 F.3d 546, 552 (3d Cir.2004) (same).

■ In the case *sub judice,* the ALJ ultimately determined that plaintiff had the RFC to perform the full range of light work. (R. 26.) This requires lifting no more than twenty pounds, with frequent lifting or carrying of up to ten pounds; the ability to do a good deal of walking or standing; or when sitting, the ability to push and pull arm or leg controls. 20 C.F.R. §§ 404.1567, 416.967. For the reasons set forth above, this court finds that substantial evidence supports the RFC determination of the ALJ. The ALJ posed a hypothetical to the VE and inquired whether an individual with plaintiff's age, education, work experience and an RFC

for light work could perform work in the national economy. (R. 84.) As heretofore stated, the VE identified the jobs of housekeeper/cleaner, hand-packer and assembler. (R. 85–86.) The ALJ posed an additional hypothetical to the VE, wherein she changed the RFC to sedentary work with a sit/stand option. *Id.* The VE opined that an individual with those limitations would be able to perform certain hand-packer jobs, assembler jobs and inspector jobs. *Id.* Finally, the ALJ asked the VE to the consider the report of Dr. Eisner. The VE opined that an individual with the limitations found by Dr. Eisner would be unable to perform any work. (R. 86.) As stated above, the ALJ set forth sufficient evidence to discredit the findings of Dr. Eisner. Therefore, the ALJ's reliance on the VE's testimony based upon the functional limitations the ALJ concluded were supported by the evidence was proper. Accordingly, this court finds that plaintiff's argument regarding the ALJ's reliance on VE testimony is without merit.

## V. CONCLUSION

After a careful review of the evidence in the record, and for the reasons set forth above, this court finds that the ALJ's findings in her decision and her conclusion that plaintiff is not disabled are supported by substantial evidence. As stated earlier, "the question is not whether we would have arrived at the same decision; it is whether there is substantial evidence supporting the Commissioner's decision." *Donatelli v. Barnhart,* 127 Fed.Appx. 626, 630 (3d Cir.2005) (not precedential) (citing *Hartranft v. Apfel,* 181 F.3d 358, 360 (3d Cir.1999)). Accordingly, the court makes the following:

## RECOMMENDATION

AND NOW, this 15th day of April, 2013, upon consideration of plaintiff's Brief and

Statement of Issues in Support of Request for Review and defendant's response thereto, it is respectfully recommended that plaintiff's request for review be **DENIED.**

Plaintiff may file objections to the Report and Recommendation. *See* Loc. R. Civ. P. 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

April 15, 2013.