NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4242
_____

KENNETH COOPER,
                                                Appellant

v.

COMMISSIONER OF SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cv-03328)
United States District Judge:  Hon. Timothy J. Savage
_____

Submitted Under Third Circuit LAR 34.1(a)
April 8, 2014

Before:  AMBRO, JORDAN and ROTH, Circuit Judges

(Filed: April 16, 2014)
_____

OPINION OF THE COURT
_____

JORDAN, Circuit Judge

        This case comes before us for the second time.  As before, Kenneth Cooper

appeals an order of the United States District Court for the Eastern District of

Pennsylvania, which approved and adopted a Magistrate Judge's Report and

Recommendation ("R&R") to affirm the decision of the Commissioner of the Social Security Administration ("SSA") finding Cooper "not disabled" and, therefore, ineligible for Supplemental Social Security Income ("SSI"), for the period from February 10, 1997, through August 31, 2004.[1] (A.R.[2] at 686.) For the reasons that follow, we will affirm.

## I.    Background

This case involves numerous medical examinations and opinions, as well as a long administrative history.

### A.    *Cooper's Medical History*

During the period at issue – again, from February 10, 1997, through August 31, 2004 – Cooper was 39 to 46 years old and lived with his girlfriend and her three children. He had a high school education, having earned a GED after completing the 11th grade. He weighed approximately 300 pounds, which, at 5'10" in height, made him morbidly obese. In addition to his obesity, Cooper had several physical and psychological problems. His primary-care physician, Dr. Joel H. Jaffe, treated him from approximately 1997 until 2003 for the physical ones. In addition, at the request of the Pennsylvania Bureau of Disability Determination (the "state agency"), Cooper saw various "consultative examiners" during the relevant period.[3]

---

[1] A later application for disability found Cooper to be disabled as of September 1, 2004.

[2] Citations to "(A.R. at __)" are to the administrative record.

[3] A consultative examination, as we use that term, refers to an examination for the purpose of assessing physical or psychological impairments as a part of the SSI application review process.

1. *Musculoskeletal System*

    a. *Foot and Ankle*

Between 1993 and 2002, Cooper sought treatment for pain associated with his left foot and ankle. For example, in 1993, he visited the emergency room, complaining of severe pain in that ankle.[4] Although the treating doctor acknowledged that Cooper's ankle pain was the subject of chronic complaint, there was "no evidence of an acute fracture, subluxation or mal-alignment." (A.R. at 286.) In 1997, Cooper visited the emergency room again and was diagnosed with a fractured toe in his left foot. Less than a year later, he visited the emergency room for a third time, this time complaining of pain in his left leg. The treating doctor was unclear as to the cause of the pain but found no evidence of a fracture. He therefore diagnosed Cooper with chronic ankle pain. Finally, in early 2002, after Cooper was diagnosed with foot "deformities," Dr. Kenneth D'Ortone operated on Cooper's foot. (A.R. at 617-21.)

    b. *Other Joints*

In addition to his foot and ankle problems, Cooper has documented impairments of his shoulder and knee. In 1998, Cooper was diagnosed by Dr. Jaffe with shoulder bursitis. In November 2002, Cooper visited Dr. Haresh Punjabi for a consultative examination. Dr. Punjabi noted that Cooper had restricted movement in his left shoulder,

---

[4] From the triage notes of the Emergency Department Record, it appears that Cooper stated he had experienced pain in his ankle since injuring it in 1985 and falling through a floor in 1992. However, in a follow-up examination with Dr. Norman Makous in August 1997, Cooper said that he was "uncertain" as to exactly how he developed ankle pain but expressed his belief that he fractured his ankle and right hand four or five years earlier when he fell "from a fence." (A.R. at 367.) The record does not show treatment for any such injuries.

which caused "painful abduction," in addition to "mild crepitus" in his right knee resulting in a "mild restriction of range of motion." (A.R. at 543.) Dr. Punjabi also noted that there was "no acute inflammation of any joint" and opined that Cooper may have "[s]evere osteoarthritis affecting the right knee and the left shoulder." (*Id.*)

### c. *Ability to Ambulate*

Despite Cooper's musculoskeletal impairments, he was observed during two separate consultative examinations moving and walking without severe limitation. In August 1997, during a consultative examination with Dr. Norman Makous, Cooper was able to "move[] and change[] position at a fair pace," while "walk[ing] briskly[,] limping and favoring [his] left foot." (A.R. at 369). Cooper also reported that he routinely "climb[ed] one flight of stairs without stopping," since he lived in an apartment on the second floor. (A.R. at 368.) During his November 2002 consultative examination with Dr. Punjabi, Cooper exhibited normal "gait," but walked slowly due to "painful weightbearing." (A.R. at 542.)

### d. *Back Pain*

In 1991, Cooper visited the emergency room for pain in his back after being struck from behind with a bat. X-rays revealed that there were"[m]inimal degenerative changes at the lower thoracic spine" and "[n]o fracture or dislocation." (A.R. at 281.) On November 7, 2002, Dr. Punjabi observed that Cooper had a "[p]araspinal muscle spasm," but he did not recommend Cooper for surgery or any type of rehabilitative treatment. (A.R. at 543).

4

### 2.    *Vision*

Cooper has poor vision in his right eye but is considered to have normal vision in his left eye.  During a March 2003 hearing, Cooper testified that he was blind in his right eye.  Nonetheless, during three separate consultative examinations, it was found that Cooper had poor vision in his right eye but not blindness.

In August 1997, during his visit with Dr. Makous, Cooper was able to see hand motion, but was unable to count fingers or read the top line in the eye chart.  Two months later, Cooper underwent an ophthalmologic evaluation from Dr. Robert Kirschner.  While Cooper was again able to see only hand motions from his right eye, his left eye had "at least" a 20/50 central visual acuity.  (A.R. at 394.)  During the exam, however, Cooper appeared "spaced out," fell asleep, and was generally uncooperative.  (A.R. at 395.)  Because of Cooper's lack of cooperation, Dr. Kirschner concluded that the exam was unsuccessful.  Finally, during Cooper's third consultative examination in November 2002, Dr. Punjabi found Cooper had 20/100 visual acuity in his right eye and 20/30 in his left eye.

In addition to the documentary medical evidence demonstrating Cooper's poor vision in his right eye, Cooper testified at the June 2000 hearing that, although he has problems with his right eye, he agreed he "can see a little bit" with it.  (A.R. at 79.)

### 3.    *Cardiovascular System*

Throughout the relevant time period, Cooper repeatedly complained of chest pains and reported smoking a pack of cigarettes per day.  In 1996, after a series of tests, Cooper was diagnosed with a heart condition, specifically a "mild degree of inferior wall

5

ischemia." (A.R. at 318.) Later that year, Cooper received an electrocardiogram ("EKG"), which showed that he had "[n]ormal left ventricular systolic function." (A.R. at 380.) Nonetheless, approximately six months later, Cooper visited the emergency room complaining of chest pain. Again, no specific cause was identified, but the treating doctor opined that the type of pain complained of is "not usually due to serious heart or lung problems." (A.R. at 354.) In 2002, Cooper reported taking nitroglycerin "with immediate relief" for his chest pain. (A.R. at 542.)

### 4.    *Affective Disorders*

Cooper went through a series of psychological and psychiatric evaluations during the relevant time period. After Dr. Jaffe found Cooper to be "seriously limited" psychologically in his abilities to do most work-related activities (A.R. at 463-65), Cooper underwent several consultative examinations over the relevant time period that revealed he was not functionally limited in a significant way.

Specifically, in March 1999, Dr. L.R. Griffin concluded after testing Cooper's IQ that Cooper "was able to understand, retain and follow the instructions without difficulty [and] should be able to do this in a work related setting." (A.R. at 476.) In a separate evaluation analyzing Cooper's ability for "activities of daily living," "social functioning," "concentration & task persistence," and "adaptation to stressful circumstances," Dr. Griffin noted that Cooper was able to maintain his own residence, pay his own bills, cook, use public transportation, and shower without assistance. (A.R. at 478-79.) While Dr. Griffin observed that Cooper exhibited poor relationships with people in authority, a lack of motivation, and a tendency to become angry when under pressure, he assessed

6

that Cooper was "able to sustain a routine and make adequate decisions." (A.R. at 479.) Dr. Griffin also found that Cooper acted with a "conscious attempt to look bad or exaggerate his illness and to malinger." (A.R. at 477.)

Later that same year, Cooper saw Dr. Carl D. Herman. While Dr. Herman had previously diagnosed Cooper with dysthymic disorder in 1998, in 2002 Dr. Herman's evaluation of Cooper was similar to that of Dr. Griffin's, noting that Cooper's "intelligence is within normal range and [there is] no evidence of organic brain dysfunction." (A.R. at 499.) That is not to say that Dr. Herman's evaluation was entirely positive: at the same time that he noted Cooper did moderate housekeeping and light cooking, went shopping with his girlfriend and her daughter, and sometimes attended church, he also said that Cooper was prone to arguing with his girlfriend and had no other friends. Overall, however, Dr. Herman found that Cooper was able to adequately interact with people of authority, satisfactorily make decisions, and fairly adapt to changes, even if his reaction to deadlines was poor.

Cooper sought treatment for his mental health briefly in 2001. He was diagnosed with bipolar disorder, but his treatment was terminated after ninety days "due to no service."[5] (A.R. at 616.) In mid-2002, Cooper returned and continued treatment until January 2003. Dr. O.D. Miles, a psychiatrist, found that Cooper's concentration, insight and judgment, and abstract thinking were all "intact." (A.R. at 598.) Dr. Miles also

---

[5] The government interprets Cooper's termination to be a result of him "not return[ing] for recommended follow-up services" (Appellee's Br. at 15), which Cooper does not dispute.

7

diagnosed Cooper with bipolar affective disorder, but treatment records show that, by December 2002, Cooper was "clinically stable" on prescribed medication. (A.R. at 601.) Cooper acknowledged as much, testifying that the medication he received during treatment "control[led his] anger so [he] won't be so angry." (A.R. at 114.)

     5.    *Residual Functional Capacity ("RFC")[6] and Vocational Evidence*

In October 1997, Dr. Joseph A. Savastio, a state agency physician, reviewed Cooper's RFC and opined that Cooper remained capable of light work that involved occasional postural activities and unlimited sitting. Similarly, Dr. Makous concluded that Cooper would be capable of light work that involved standing and walking for less than two hours and could perform work while sitting without any restrictions. In a follow-up consultative exam by Dr. Punjabi, Cooper was determined to have full motor strength.

At the request of the reviewing Administrative Law Judge ("ALJ"), a vocational expert also assessed Cooper's abilities. The ALJ asked the vocational expert what work, if any, a person of Cooper's vocational profile and RFC could perform. The vocational expert considered Cooper's physical functional limitations (*i.e.*, the various weights that he could lift and carry occasionally) in conjunction with his visual and mental impairments. The expert identified the unskilled, sedentary jobs of assembler and inspector and indicated that, despite his impairments, Cooper could still perform.

---

[6] A claimant's RFC "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

B.    *Procedural History*

On February 10, 1997, Cooper filed an application for SSI with the state agency. After repeatedly being denied benefits by the state agency and the ALJ, Cooper filed a civil action in the Eastern District of Pennsylvania seeking review of the Commissioner's decision. The matter was referred to a Magistrate Judge who, in 2006, issued an R&R suggesting that the ALJ's decision be affirmed, which it was. *Cooper v. Barnhart*, No. 04-3663 (E.D. Pa. Aug. 15, 2006). Cooper then appealed that decision to us, and we vacated the court's affirmance. *Cooper v. Comm'r of Soc. Sec. Admin.*, 268 F. App'x 152, 157 (3d Cir. 2008). Specifically, we instructed that, on remand to the agency, "the Commissioner should consider Cooper's physical and psychological ailments in combination with each [other] and *especially with regard to his obesity*" and, if the disability analysis reaches step five of the SSA's evaluation process (work availability), to "take Cooper's vision problems into account." *Id.* at 156 (emphasis added).

The same ALJ that presided over the earlier proceedings held a hearing on remand. On March 5, 2010, that ALJ issued an "unfavorable" decision for Cooper, finding that Cooper could perform a modified range of unskilled, light work, and was therefore not disabled. (A.R. at 670.) The ALJ stated that, "[w]hen assessing this claim at all steps of the sequential evaluation process ... [,] any additional and cumulative effects of obesity" were considered at step three. (A.R. at 676.) The ALJ also "found that the claimant's right eye vision was poor, but that he was not totally blind in that eye" such that the "established visual limitations [were] appropriate." (A.R. at 676, 684.) A vocational expert further testified that, given Cooper's visual acuity, he would still be

9

able to perform the tasks required of an assembler and inspector. Although Cooper then requested review of the ALJ's decision by the SSA Appeals Council (the "Council"), the Council issued a statement explaining that it "found no reason ... to assume jurisdiction" over the case. (A.R. at 775.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

Cooper then filed the present case in the Eastern District of Pennsylvania, seeking review of the ALJ's last decision in light of our remand instructions. The matter was again referred to the same Magistrate Judge. *See Cooper v. Colvin*, No. 12-3328 (E.D. Pa. July 25, 2013). The Magistrate Judge issued a new R&R recommending that the Commissioner's decision be affirmed, and the District Court followed that recommendation.

This timely appeal followed.

## II.    Discussion[7]

Cooper contends that his circumstances again require agency reconsideration. In sum, the argument is that the ALJ failed to review Cooper's impairments in combination

---

[7] The District Court had jurisdiction over the Commissioner's final determination of Cooper's SSI claim under 42 U.S.C. §§ 405(g), 1383(c)(3). We have jurisdiction over the District Court's determination pursuant to 28 U.S.C. § 1291. "The role of this Court is identical to that of the District Court, namely to determine whether there is substantial evidence to support the Commissioner's decision." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (citing *Reefer v. Barnhart,* 326 F.3d 376, 379 (3d Cir. 2003)). In other words, it is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Id*. (internal quotation marks omitted). As long as there is substantial evidence to support the decision of the Commissioner, "our review of the ALJ's decision is more deferential." *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

10

with one another at step three; the ALJ ignored Cooper's impaired vision in his right eye in finding him capable to perform the jobs of assembler and inspector; and the ALJ disregarded Dr. Herman's opinions.[8] We disagree on all points.

"In order to establish a disability under the Social Security Act, a claimant must demonstrate there is some medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotation marks omitted). The Commissioner has developed a five-step sequential evaluation process to determine if a person is disabled under the Act. 20 C.F.R. § 416.920(a)(4). That process requires an ALJ to consider whether the claimant: (1) is engaged in substantial, gainful

---

[8] Cooper also argues that the ALJ abused his discretion in denying Cooper's request for additional medical expert testimony. While it is in the discretion of the ALJ to determine whether medical expert testimony is warranted, *see* 20 C.F.R. § 416.927(e)(2)(iii), the SSA requires an ALJ to seek a medical expert's opinion in three instances: (1) when the Council or court so orders; (2) to evaluate and interpret background medical test data; and (3) when an ALJ "is considering a finding that the claimant's impairment(s) medically equals a medical listing." (J.A. at 117). Cooper's argument that the ALJ failed to heed the Council's August 2002 order to "[o]btain evidence from a medical expert to clarify the nature and severity of claimant's impairments" (A.R. at 199) not only overlooks Dr. Punjabi's November 2002 consultative examination, but also is waived considering there is no evidence in the record to indicate that it was raised before. *Cf. Smith v. Comm'r*, 631 F.3d 632, 637 (3d Cir. 2010) ("Smith's failure to raise any argument as to Dr. Edelman in that Court operates to waive that argument here."). With respect to the arguments that the ALJ failed to evaluate Cooper's cognitive and ankle impairments because the ALJ did not seek additional medical expert evidence, there is no basis to say there was an abuse of discretion given the ample medical evidence already on the record. *Cf.* 20 C.F.R. § 416.927(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to subpart P of part 404 of this chapter."); *Knepp*, 204 F.3d at 83 ("[W]e determine whether there is substantial evidence to support the decision of the Commissioner.").

work activity; (2) has severe medical impairments; (3) has an impairment that "meets or equals" one of the SSA's "listed" impairments; (4) can return to his "past relevant work"; and, if not, (5) can perform other work consistent with his RFC. *Id.* With respect to step three, it is the responsibility of the ALJ to determine medical equivalence to the listed impairments, as required by the SSA. *Id.* § 416.926(e); *see also Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000) ("Knepp ... argues that only a physician designated by the Commissioner can decide the question of medical equivalency. This argument misapprehends 20 C.F.R. § 404.1526. The ultimate decision concerning the disability of a claimant is reserved for the Commissioner." (citation omitted)).

It is undisputed that Cooper was not engaged in gainful activity during the relevant period, so step one of the evaluation process is not at issue. While the ALJ found at step two that Cooper's "disorders of the low back, left shoulder, right knee, and both feet; poor right eye vision; coronary artery disease; obesity, and a bipolar disorder with dysthymia" were indeed severe impairments, at step three the ALJ did not find that they met or were medically equal to, either alone or in combination, any of the impairments listed in 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. (A.R. at 676.) Moving on to step four, the ALJ determined that, although Cooper retained the RFC to perform a modified range of unskilled, light work, he had no past relevant work. Finally, at step five, after considering Cooper's age, education, RFC, and the testimony of the vocational expert, the ALJ concluded that, during the time period in question, Cooper was capable of performing jobs such as assembler and inspector, and therefore was not disabled under

12

the Act. In the end, the parties are only at odds over the ALJ's conclusions at steps three and five.

A.    *Step Three*

In our 2008 decision to vacate and remand Cooper's earlier claim, we specifically instructed the Commissioner to consider Cooper's impairments in combination with each other, especially in regard to his obesity. *Cooper*, 268 F. App'x at 156. An ALJ is expected not only to discuss the evidence upon which his decision is based but also to explain the reasoning for his determination so that we may meaningfully review a denial. *Burnett v. Comm'r*, 220 F.3d 112, 119-20 (3d Cir. 2000). This includes a meaningful consideration of a person's obesity in combination with other impairments. *Diaz v. Comm'r*, 577 F.3d 500, 504 (3d Cir. 2009). We do not, however, require that an ALJ "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). In other words, an ALJ "need not employ particular 'magic' words" in his decision. *Diaz*, 577 F.3d at 504.

Although it would have been helpful had the ALJ more thoroughly explained the combined effects of Cooper's impairments, we nonetheless conclude that the ALJ conducted his analysis in a manner sufficient for us to engage in meaningful review. Prior to the evaluation of each of Cooper's impairments, the ALJ explicitly stated that he "considered any additional and cumulative effects of obesity." (A.R. at 676.) Turning to the various impairments, the ALJ first considered Cooper's musculoskeletal impairments and acknowledged the ankle and foot problems, joint pains, and obesity. However, based on the observations of both Dr. Makous and Dr. Punjabi, who reported that Cooper was

13

able to "walk[] briskly" and exhibited a normal gait (A.R. at 369), the ALJ concluded that "[e]ven considering [Cooper's] morbid obesity, there is no evidence of … ineffective ambulation or inability to perform fine and gross movements required by [the] listing." (A.R. at 677).[9]

Second, the ALJ considered whether Cooper's back problems met the requirements for the listing on disorders of the spine. The medical evidence in the record supports the ALJ's conclusion that there was "no evidence of motor, sensory, or reflex loss." (A.R. at 678.) While Dr. Punjabi observed Cooper suffering from a paraspinal muscle spasm during Cooper's 2002 consultative exam, he also noted that Cooper had no problem climbing onto the examination table. The ALJ considered that evidence in combination with Cooper's acknowledgment that he could bend at the waist "a little bit" (A.R. at 118) to evaluate Cooper's ability to perform postural activities.

---

[9] While Cooper contends that the ALJ "simply ignored Dr. Makous' postural preclusions" (Appellant's Br. at 39), it is within the ALJ's discretion to weigh the evidence, even ignoring the opinion of one doctor regarding one diagnosis when accepting an opinion from the same doctor on a separate diagnosis. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361-62 (3d Cir. 2011) ("We also note that the ALJ did not merely rubber stamp Dr. Popat's RFC conclusion. Instead, the ALJ found persuasive and incorporated DeWees's opinion that Chandler cannot sit for more than thirty minutes at a time, even though the ALJ was not required to consider DeWees's opinion at all ... . The ALJ also added restrictions Dr. Popat did not deem necessary." (citations omitted)); *cf. Ray v. Astrue*, 649 F. Supp. 2d 391, 402 (E.D. Pa. 2009) ("The Third Circuit has emphasized that the ALJ must provide these explanations for only 'pertinent or probative evidence,' because '[o]verwhelming evidence in the record' can render other evidence 'irrelevant' and thus not worthy of the ALJ's explanation of its disregard."). As the government correctly notes, the ALJ did not credit Dr. Makous's opinion that "Cooper had no ability to perform postural activities because that part of his opinion was inconsistent with other substantial evidence in the record, such as the opinions of Dr. Punjabi and Dr. Savastio ... and Cooper's own admission that he could climb a flight of stairs to his home." (Appellee's Br. at 43 (citation omitted).)

Third, the ALJ revisited the evidence pertaining to Cooper's vision, citing two different eye examinations that support the conclusion that Cooper had poor vision in his right eye but, importantly, was not blind, and that his left eye was normal.[10] For purposes of an SSI determination, blindness is defined as "visual acuity of 20/200 or less in the better eye with the use of a correcting lens." 20 C.F.R. § 416.981. The ALJ reviewed Cooper's 1997 exam with Dr. Kirschner, and, although Dr. Kirschner ultimately considered the exam unsuccessful due to Cooper's failure to cooperate, it still revealed that Cooper had limited vision in his right eye and "at least" 20/50 in his left. (A.R. at 394.) Likewise, Dr. Punjabi determined in 2002 that Cooper had 20/100 vision in his right eye and 20/30 vision in his left eye. [11]

Fourth, the ALJ discussed Cooper's complaints about chest pains. To meet the requirements of the cardiovascular listing, a person must demonstrate evidence of chronic heart failure, ischemic heart disease, or other end organ damage from hypertension. 20 C.F.R. pt. 404, subpt. P, app. 1. But, as the ALJ noted, Cooper never received treatment for any heart disorders, nor was there evidence to support that he had a coronary impairment in conjunction with his obesity. Rather, medical documents in the record

---

[10] Cooper repeatedly draws our attention to our previous opinion, where we stated that Cooper was "blind[] in his right eye" and "partial[ly] blind[] in his left eye." *Cooper*, 268 F. App'x at 154. Given the record now before us, substantial evidence supports that Cooper is not blind in either eye and indeed has "normal" vision in his left eye.

[11] The ALJ also referred to an eye examination conducted in 2004 for a later disability claim. While it is unknown exactly when that exam was conducted, and whether it fell within the period now at issue, Cooper apparently tested with a visual acuity of 20/40 in his right eye and 20/30 in his left eye.

15

reveal that Cooper had only a "[m]ild degree of inferior wall ischemia" (A.R. at 318 (emphasis added)), and the chest pains that Cooper complained of were "not usually due to serious heart or lung problems" (A.R. at 354). Moreover, Cooper acknowledged that taking nitroglycerin provided him "with immediate relief" from pain. (A.R. at 542.)

Finally, while the ALJ conceded that Cooper's "psychological impairment may have met some of the criteria" of the listing for Affective Disorders, the ALJ still found that Cooper's functional limitations were only moderate, given Cooper's relative stability. (A.R. at 679.) The ALJ noted Dr. Jaffe's claim that Cooper was "seriously limited" but found that diagnosis unavailing since Dr. Jaffe is not a psychiatrist or psychologist and, more critically, "there is nothing in his treatment notes during that period that would support his opinions." (A.R. at 680.) With respect to Dr. Herman's opinion that Cooper had poor ability to function in some areas, the ALJ determined that that assessment should receive less weight than the "treating source" – the psychiatrist whom Cooper visited for treatment – who found Cooper stable. (A.R. at 680.) Moreover, Dr. Herman's opinion is inconsistent, given that he found Cooper to be adequately able to interact with people of authority, make decisions, and adapt to changes.

It is the ALJ who must determine what weight should be accorded the various medical opinions in the record. 20 C.F.R. § 416.927. The ALJ considered Cooper's allegations in the context of all the evidence in the record, which showed that Cooper's symptoms stabilized when he was on medication, that his treating psychiatrist found that he had only moderate symptoms, that Cooper himself admitted that his medication helped

16

him control his temper, and that there was no evidence in the record that Cooper suffered from organic brain dysfunction. Here, the ALJ's findings of fact at step three are supported by evidence that a "reasonable mind" could accept as adequate, *Rutherford,* 399 F.3d at 552, and that is enough.

B.      *Step Five*

At step five, the burden shifts to the Commissioner to show that work exists in significant numbers in the national economy given a claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 416.912(e), 416.920(a)(4)(v); *see also Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003) (discussing the shifting of the burden). On remand, we instructed the Commissioner to consider whether Cooper's eyesight left him with the RFC to perform sedentary work. *Cooper*, 268 F. App'x at 157. Since we have already concluded that substantial evidence supports the ALJ's conclusion that Cooper is not blind in his right eye, we now consider whether his poor vision in that eye was a factor that the ALJ adequately took into account when determining Cooper's RFC.

At the remand hearing, the ALJ posed a hypothetical to a vocational expert to determine whether any work existed for Cooper in light of his impairments. The ALJ specifically included in the hypothetical that the individual in question had, in addition to other impairments, "poor vision in [his] right eye but near perfect vision in the left eye." (A.R. at 831.) The ALJ then added that the hypothetical individual is "monocular and therefore limited in depth perception, accommodation and field of vision." (*Id.*) The vocational expert testified that this hypothetical individual would be able to perform the jobs of assembler or inspector, which existed in significant numbers in the national

17

economy at that time. In fact, when asked by Cooper's counsel whether such jobs could be appropriate given Cooper's vision, the vocational expert confirmed that those jobs could be performed by an individual with Cooper's visual ability and other limitations. Therefore we conclude that substantial evidence supports the ALJ's ruling at step five that there were jobs in the national economy which Cooper could have performed given his impairments and, accordingly, that Cooper was not disabled under the Act.

## III. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.