**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1168
_____

ROSEANN ZIRNSAK,
Appellant

v.

CAROLYN W. COLVIN,
COMMISSIONER SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2:13-cv-00303)
District Judge:  Honorable David Stewart Cercone
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
December 9, 2014

Before:  VANASKIE, COWEN and VAN ANTWERPEN,
*Circuit Judges*.

(Opinion Filed:  December 9, 2014)
_____

Sarah H. Bohr, Esq.
Bohr & Harrington, LLC
2337 Seminole Road
Atlantic Beach, FL 32233
    *Counsel for Appellant Roseann Zirnsak*

Elizabeth A. Smith, Esq.
129 S. McKean Street
Butler, PA 16001
    *Counsel for Appellant Roseann Zirnsak*

Nora Koch, Esq.
Taryn Jasner, Esq.
Social Security Administration
Office of the General Counsel
PO Box 41777
Philadelphia, PA 19101
    *Counsel for Appellee Carolyn W. Colvin, Commissioner*
*Social Security*

David J. Hickton, Esq.
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
    *Counsel for Appellee Carolyn W. Colvin, Commissioner*
*Social Security*

Beverly H. Zuckerman, Esq.
Social Security Administration
Office of General Counsel SSA/OGC/Region III
300 Spring Garden Street

6th Floor
Philadelphia, PA 19123
　*Counsel for Appellee Carolyn W. Colvin, Commissioner*
*Social Security*

─────────────

OPINION OF THE COURT

─────────────

VAN ANTWERPEN, *Circuit Judge*.

Appellant Roseann Zirnsak brings this action to appeal the final decision of the District Court for the Western District of Pennsylvania, dated December 5, 2013, affirming the denial of her claim for Social Security Disability Income benefits. *Zirnsak v. Colvin*, No. 2:13cv303, 2013 WL 6622925 (W.D. Pa. Dec. 5, 2013). For the reasons that follow we will affirm the decision of the District Court.

## I. FACTUAL BACKGROUND AND PROCEDURAL

### HISTORY

In October of 2001, Ms. Roseann Zirnsak ("Zirnsak" or "the claimant") was involved in a motor vehicle accident in which she sustained head and lung injuries and skeletal fractures. *Zirnsak v. Colvin*, No. 2:13cv303, 2013 WL 6622925, at *3 (W.D. Pa. Dec. 5, 2013). She was hospitalized following that incident from October 8, 2001 through November 14, 2001. *Id.* While hospitalized, she was temporarily on life support. *Id.* Upon her discharge, she was sent to a rehabilitation facility. *Id.* Four days after entering the rehabilitation facility, she returned to the hospital for a

3

procedure to have her gangrenous gallbladder removed. *Id.* After her discharge following that procedure, she again returned to the rehabilitation facility. *Id.* Zirnsak continued to be treated at a rehabilitation facility from January 16, 2002 through October 18, 2005. *Id.* In February of 2003, she suffered a seizure and sought treatment immediately thereafter. *Id.* She was prescribed medication, and she did not suffer any further seizures. *Id.* Between January 5, 2005 and August 11, 2006, Zirnsak underwent plastic surgery treatments for lipoma reductions. *Id.* at *4.

In the years following her accident, Zirnsak sought treatment from several medical professionals. Zirnsak received the following treatment relevant to her mental condition. Zirnsak was treated by Dr. Thomas Franz, M.D., from February 22, 2003 through February 3, 2010. *Id.* Dr. Franz treated Zirnsak for "traumatic brain injury, left hemiparesis cognitive impairments with short-term memory deficits, organic affective changes[,] and a seizure disorder." *Id.* Dr. Kevin Kelly, M.D., Ph.D., treated Zirnsak from February 14, 2003 through February 4, 2010. *Id.* He diagnosed Zirnsak with a seizure disorder. *Id.* Dr. David Newman, Ph.D., evaluated Zirnsak over a three-day period— from April 4–6, 2010. *Id.* His report summarizing that evaluation noted "a suggestion of mild short-term memory loss and a concentration deficit." *Id.* Finally, on April 8, 2010, Michelle Santilli, Psy. D., performed a mental residual functional capacity ("RFC") assessment of Zirnsak. *Id.* She concluded that Zirnsak could perform competitive work on a sustained basis. *Id.*

On January 6, 2010, Zirnsak applied for Social Security Disability Insurance ("SSDI") benefits alleging a

4

disability commencing on May 11, 2006. *Id.* at *1.[1] The parties agree that Zirnsak's date last insured was December 31, 2007. (Transcript ("Tr.") at 32).[2] Accordingly, the relevant period for Zirnsak's disability determination is the period from May 11, 2006 to December 31, 2007. The Social Security Administration ("SSA") denied Zirnsak's application on May 17, 2010. (*Id.*). On June 14, 2010, Zirnsak requested a hearing, which was subsequently held on June 22, 2011. (*Id.*). At the hearing, Administrative Law Judge ("ALJ") James P. Pileggi heard testimony from Zirnsak, her husband, and a vocational expert. (*Id.* at 30–59). On July 15, 2011, ALJ Pileggi issued a decision denying Zirnsak's application for benefits. *Zirnsak*, 2013 WL 6622925, at *1. He found that Zirnsak was "not under a disability, as defined in the Social Security Act, at any time from May 11, 2006, the amended alleged onset date, through December 31, 2007, the date last insured." (Tr. at 22). As part of that finding, ALJ Pileggi found that Zirnsak was capable of performing certain jobs available in the national economy, so long as those jobs were sedentary and routine. (*Id.* at 16). He based that finding, in part, on testimony from a vocational expert who opined that Zirnsak was capable of working as an order clerk (food and

---

[1] Zirnsak's initial application asserted a disability onset date of October 8, 2001. *Zirnsak*, 2013 WL 6622925, at *1. However, at the June 22, 2011 hearing, the parties agreed to amend the onset of disability date to May 11, 2006. (Transcript at 31–32). May 11, 2006 is the day immediately following the date on which a prior application for SSDI benefits for Zirnsak was denied. (*Id.* at 32).

[2] "Tr. at _" refers to the administrative transcript filed in this case on February 27, 2014.

beverage), charge account clerk, telephone clerk, or sedentary subassembler. (*Id.* at 21–22).

That decision became final on January 9, 2013, when, after reconsideration, the Appeals Council affirmed the prior determination. *Zirnsak*, 2013 WL 6622925, at *1. On March 1, 2013, Zirnsak filed a complaint pursuant to 42 U.S.C. § 405(g) seeking review of the Commissioner's final determination. *Id.* On August 12, 2013, United States Magistrate Judge Robert C. Mitchell filed a Report and Recommendation indicating that the decision of the Commissioner should be affirmed. *Id.* On December 3, 2013, United States District Judge David Stewart Cercone filed an Order adopting the Magistrate Judge's Report and Recommendation as the opinion of the district court, affirming the denial of Zirnsak's claim for SSDI benefits, and entering judgment for the Commissioner. *Id.* Zirnsak timely filed this appeal on January 21, 2014.

## II.    DISCUSSION[3]

### 1.    *Standard of Review*

---

[3] The District Court had jurisdiction to review a final administrative decision by the Social Security Commissioner pursuant to 42 U.S.C. § 405(g). We have jurisdiction to review the District Court's December 3, 2013 Order denying Zirnsak's motion for summary judgment and granting the Commissioner's motion for summary judgment pursuant to 28 U.S.C. § 1291 and 42 U.S.C. § 405(g).

6

This Court reviews any findings of fact made by an ALJ under the deferential "substantial evidence" standard. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir. 1999). We must affirm the ALJ so long as his conclusions are supported by substantial evidence. *Craigie v. Bowen*, 835 F.2d 56, 57 (3d Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* We review the record as a whole to determine whether substantial evidence supports a factual finding. *Schaudeck*, 181 F.3d at 431. When performing that review, we are mindful that we must not substitute our own judgment for that of the fact finder. *Rutherford*, 399 F.3d at 552. We exercise plenary review over the District Court's determination of legal issues. *Schaudeck*, 181 F.3d at 431.

2.    *The Administrative Law Judge's Assessment of Zirnsak's Mental Residual Functioning Capacity*

The core issue in this case is whether Zirnsak was disabled within the meaning of the Social Security Act at any point during the period from May 11, 2006 through December 31, 2007. Section 423(d)(1)(A) of the Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled if her impairments are severe enough that not only is she

7

incapable of performing her previous work, but she is also incapable of engaging in "any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). It is the claimant's burden to establish that she is disabled. *See id.* § 432(d)(5)(A) ("An individual shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). The claimant must also establish that the onset date of disability occurred prior to the expiration of the claimant's insured status. 20 C.F.R. § 404.131 (2014).

A five-step, sequential evaluation process is employed to determine whether a particular claimant has met the burden of establishing disability. *Id.* § 404.1520(a). The five-step inquiry proceeds as follows. First, the Commissioner considers whether the claimant is "engaging in substantial gainful activity." *Id.* § 404.1520(a)(4)(i). If yes, then the claimant is not disabled. *Id.* Second, the Commissioner considers the severity of the claimant's impairment(s). *Id.* § 404.1520(a)(4)(ii). If the claimant's impairment(s) are either not severe or do not meet the duration requirement, the claimant is not disabled. *Id.* Third, the Commissioner considers whether the claimant's impairment(s) meet or equal the requirements of one of the Commissioner's listed impairments. *Id.* § 404.1520(a)(4)(iii). If the claimant's impairment(s) meet the requirements of a listed impairment, then the claimant is disabled. *Id.*

If not, then the inquiry proceeds to the fourth step, where the Commissioner considers whether the claimant can return to her past work. *Id.* § 404.1520(a)(4)(iv). To determine whether the claimant can perform her past work,

the Commissioner assesses the claimant's residual functional capacity ("RFC"). *Id.* § 404.1520(e). A claimant's RFC measures "the most [she] can do despite [her] limitations." *Id.* § 404.1545(a)(1). The Commissioner examines "all of the relevant medical and other evidence" to make its RFC determination. *Id.* § 404.1545(a)(3). If the Commissioner finds that the claimant can still perform her past work, she is not disabled. *Id.* § 404.1520(a)(4)(iv). It is important to note that during steps two through four of the inquiry, the claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work. *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983).

If the claimant meets those burdens by a preponderance of the evidence, then the inquiry proceeds to step five, where the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing. 20 C.F.R. § 404.1520(a)(4)(v) (2014); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). To meet this burden, the Commissioner must produce evidence that establishes that "work exists in significant numbers in the national economy that [the claimant] can do." 20 C.F.R. § 404.1560. The Commissioner uses the RFC assessment, *Id.* at § 404.1520(e), and the testimony of vocational experts and specialists, *Id.* § 404.1566(e); 416.966(e), to make this determination. "Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy." *Provenzano v. Comm'r*, Civil No. 10–4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011).

9

Zirnsak's first argument on appeal is that the ALJ's assessment of her mental RFC is not supported by substantial evidence. Specifically, Zirnsak argues that the ALJ erred in (1) rejecting evidence from certain lay witnesses and (2) according "little weight" to the opinion of Dr. Newman, the doctor who evaluated Zirnsak on April 4–6, 2010. (Appellant's Brief ("Br.") at 24–25). Zirnsak contends that both categories of testimony provide objective evidence of a memory impairment that was not accounted for in the ALJ's RFC finding, and that therefore the ALJ should have afforded them more weight. (*Id.* at 26).

### A. Lay Testimony

It is the claimant's burden to establish that she became disabled at some point between the onset date of disability and the date that her insured status expired. In Zirnsak's case, this period ranges from May 11, 2006 through December 31, 2007. As part of the five-step disability inquiry, an ALJ can consider evidence from non-medical sources to determine the severity of a claimant's impairments and how those impairments impact the claimant's ability to work. 20 C.F.R. § 404.1513(d) (2014). Non-medical sources include "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy." *Id.* § 404.1513(d)(4). The Commissioner has issued a policy interpretation ruling "to clarify how [to] consider opinions from sources who are not 'acceptable medical sources.'" SSR 06-03p, 2006 WL 2329939, at *1 (Aug. 9, 2006). This ruling states that ALJs should consider "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute

10

the evidence" when evaluating evidence from non-medical sources such as family or friends. *Id.*

To properly evaluate these factors, the ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. *See Diaz v. Comm'r*, 577 F.3d 500, 506 (3d Cir. 2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses . . . ."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (citing *Stewart v. Sec'y of Health, Education and Welfare*, 714 F.2d 287, 290 (3d Cir. 1983)); *see also Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. *Ray v. Astrue*, 649 F. Supp. 2d 391, 402 (E.D. Pa. 2009) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

In 2011, several members of Zirnsak's family and friends submitted letters to the ALJ on her behalf. (Tr. at 19). Each letter stated that Zirnsak "suffer[ed] from substantial difficulties." (*Id.*). The ALJ found that these letters were only "partially credible" and therefore accorded them "little weight." (*Id.* at 20). The ALJ specifically referenced the three SSR 06-3p factors in explaining this decision. (*Id.*). First, the ALJ acknowledged that Zirnsak's friends and family each clearly had an established relationship with her. (*Id.*). Second, he explained that the letters' references to Zirnsak's significant limitations were inconsistent with her limited

11

medical treatment during the relevant period. (*Id.*). Finally, the ALJ noted that the letters did not directly address Zirnsak's condition during the relevant period—from May 11, 2006 through December 31, 2007. (*Id.*). The ALJ used the same process to evaluate the testimony of the claimant's husband, Donald Zirnsak. (*Id.*). The ALJ noted that Donald Zirnsak and the claimant had an established relationship. (*Id.*). However, the ALJ ultimately found Donald's testimony not credible because of its inconsistencies with Zirnsak's limited treatment and her reported activities of daily living. (*Id.*).

In evaluating the lay testimony of Zirnsak's family, friends, and husband, the ALJ explicitly followed the guidance set forth in SSR 06-03p. He evaluated the relevant factors, assessed the credibility of certain evidence, and explained why he found certain evidence to be not credible. *Ray*, 649 F. Supp. 2d at 402. His reasons for rejecting the evidence are supported by substantial evidence, as the evidence did not relate to the narrow question presented to the ALJ: whether Zirnsak was disabled at any point between May 11, 2006 and December 31, 2007. We therefore defer to the ALJ's credibility assessments. *Diaz*, 577 F.3d at 506.

In her brief, Zirnsak argues that two Social Security Rulings and a series of other cases compel a contrary result. (Appellant's Br. at 30–32, 43). This reliance is misplaced. First, the two Social Security Rulings relied on by Zirnsak are not designed to provide guidance for how to evaluate lay opinion testimony. The purpose of the first ruling cited, SSR 83-20, is to "describe the relevant evidence to be considered when establishing the *onset date* of disability," not whether disability exists. SSR 83-20, 1983 WL 31249, at *1 (1983)

12

(emphasis added). The second ruling cited by Zirnsak, SSR 96-7p, lists its purpose as "to clarify when the evaluation of symptoms, including pain, . . . requires a finding about the credibility of an individual [claimant's] statements." SSR 96-7p, 1996 WL 374186 (July 2, 1996). Therefore, SSR 96-7p does not address lay witnesses' accounts of the claimant's symptoms, but rather *the claimant's* description of her own pain. *Id.* Accordingly, the claimant's arguments based upon these rulings and certain cases interpreting those rulings are inapposite. Therefore, the record is insufficient to establish that the ALJ erred in according little weight to the testimony of Zirnsak's friends and husband.

## B.    Dr. Newman's Testimony

Zirnsak also argues that the ALJ erred in according the opinion of Dr. Newman, the consultative psychologist who examined Zirnsak in 2010, little weight. (Appellant's Br. at 46). Under 20 C.F.R. § 404.131, a claimant is required to prove that she became disabled prior to the expiration of her insured status. 20 C.F.R. § 404.131 (2014); *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). Here, the parties do not dispute that Zirnsak's insured status expired on December 31, 2007. To determine whether a claimant became disabled prior to the expiration of her insured status, the ALJ must consider all relevant evidence, including medical evidence, in the record. *Adorno*, 40 F.3d at 48 (citing *Stewart*, 714 F.2d at 290). However, the ALJ is free to accept some medical evidence and reject other evidence, provided that he provides an explanation for discrediting the rejected evidence. *Id.*; *see also Stout*, 454 F.3d at 1054 (emphasizing that it is the role of the ALJ, and not the reviewing court, to articulate specific reasons for rejecting evidence).

13

Here, the ALJ did articulate a specific reason for giving Dr. Newman's evaluation little weight—"because it was completed considerably outside of the relevant period." (Tr. at 18). We must therefore evaluate whether substantial evidence supports that determination. We find that it does. As stated many times in this opinion, the inquiry in this case is limited to the narrow question of whether Zirnsak was disabled within the meaning of Section 423(d)(1)(A) of the Social Security Act during the period of May 11, 2006 through December 31, 2007. Dr. Newman's examination was conducted on April 6, 2010, over two years after the expiration of Zirnsak's insured status. (Tr. at 884). At no point does the report assert that it is a retroactive evaluation of Zirnsak's condition. (*Id.* at 884–87). The report refers to Zirnsak's "*current* complaint[s]." (*Id.* at 884 (emphasis added)). It provides a summary of her *current* daily living activities. (*Id.*). It then goes on to provide an assessment of Zirnsak's *current* mental status—as of April 6, 2010. (*Id.* at 885). In short, the report never explicitly addresses Zirnsak's condition during the period from May 11, 2006 through December 31, 2007. Accordingly, the report has little, if any, relevance to whether Zirnsak was disabled during that time. For that reason, the ALJ did not err in giving the report little weight.

### 3. *The Hypothetical Question Posed to the Vocational Expert*

Zirnsak next argues that the ALJ's decision is not supported by substantial evidence because the hypothetical question posed to the vocational expert (hereinafter "VE") was deficient for failure to fully reflect Zirnsak's limitations.

14

(Appellant's Br. at 49). Specifically, Zirnsak argues that the hypothetical should have addressed her short-term memory impairment and her "task problems" impairment. (*Id.* at 50). "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). Usually, the ALJ will ask whether a hypothetical claimant with the same physical and mental impairments as the claimant can perform certain jobs that exist in the national economy. *Id.* The hypothetical must "accurately portray" any impairments of the claimant. *Rutherford*, 399 F.3d at 554. This Court has held that to accurately portray a claimant's impairments, the ALJ must include all "*credibly established limitations*" in the hypothetical. *Id.* (citing *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999)).

Our decision in *Rutherford v. Barnhart* explains the framework employed by this Circuit to determine whether a limitation is credibly established. 399 F.3d 546, 554 (3d Cir. 2005). First, limitations that are supported by medical evidence and are "otherwise uncontroverted in the record" *must* be included in the ALJ's hypothetical for us to rely on the VE's response to that hypothetical. *Id.* However, where a limitation is supported by medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to choose whether to include that limitation in the hypothetical. *Id.* This discretion is not unfettered—the ALJ cannot reject evidence of a limitation for an unsupported reason. *Id.* Finally, the ALJ also has the discretion to include a limitation that is not supported by any medical evidence if the ALJ finds the impairment otherwise credible. *Id.*

15

Zirnsak's assertions that she suffered from short-term memory and task problem impairments fall into the second category of the framework explained in *Rutherford*: they are supported by medical evidence, but that evidence is controverted by other evidence in the record. *Rutherford*, 399 F.3d at 554. Two medical examinations support Zirnsak's contention that she suffered from both impairments during the relevant period. Doctor Franz's July 14, 2006 medical examination of Zirnsak noted a short-term memory problem. (Tr. at 826–27). His July 20, 2007 medical examination of Zirnsak similarly noted short-term memory and task problems. (*Id.* at 830–31).

However, this medical evidence is disputed by other evidence in the record. First, Zirnsak's responses to an "Activities of Daily Living" questionnaire contradict the notion that she had short-term memory or task problems. (Tr. at 167–78). One section of the questionnaire addresses "problems you [the claimant] might have thinking or concentrating." (*Id.* at 171–73). In that section, Zirnsak noted that she did not require special help to take care of her personal needs. (*Id.* at 171). She also responded that she did not have any problems going out in public or getting along with family, friends, or neighbors. (*Id.* at 172). She further stated that she was able to "start and complete projects or activities such as reading a book, putting a puzzle together, sewing/needlepoint, fixing things around the house, etc." (*Id.*). She also responded that she did not have trouble understanding instructions and carrying them out. (*Id.* at 173). However, Zirnsak's testimony at the hearing before the ALJ

16

contradicts her own questionnaire responses. [4] Second, Zirnsak testified during her hearing that she regained her driver's license in May of 2007. (*Id.* at 36).[5] She testified that while she usually drove with her husband, she was only able to drive herself short distances alone during the relevant period. (*Id.* at 37).

This Circuit does "not require an ALJ to submit to the [VE] every impairment *alleged* by a claimant." *Rutherford*, 399 F.3d at 554. Rather, the ALJ is only required to submit credibly established limitations. *Id.* Where, as here, a limitation is supported by some medical evidence but controverted by other evidence in the record, it is within the ALJ's discretion whether to submit the limitation to the VE. *Id.* While the record in this case is not conclusive as to whether Zirnsak had short-term memory or task problem limitations, there is substantial evidence to support a finding that she did not—namely, her lack of demonstrated problems with activities of daily living and her ability to drive. The ALJ therefore appropriately exercised his discretion when determining which limitations to submit to the VE. In making credibility determinations like this one, this Court will "not substitute our own judgment for that of the fact finder." *Id.* at 552. Accordingly, we find that the hypothetical question

_____

[4] When asked at the hearing about her thinking ability during the relevant period, Zirnsak responded, "I don't remember a lot." (Tr. at 43). She testified that she was unable to pay attention for a full thirty-minute sitcom episode and that she struggled with addition and balancing a checkbook. (*Id.* at 46–47).

[5] Zirnsak temporarily lost her driver's license after her seizure.

posed to the VE was not deficient for failure to fully reflect Zirnsak's limitations.

### 4. Conflict Between VE Testimony and Dictionary of Occupational Titles

Zirnsak's final argument is that the ALJ's failure to resolve conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT") warrants remand of her case. (Appellant's Br. at 51). In step five of the disability inquiry, the Commissioner bears the burden of establishing the existence of jobs in the national economy that an individual with the claimant's impairments is capable of performing. 20 C.F.R. § 404.1520(a)(4)(v), § 404.1560 (2014); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). To determine what type of work (if any) a particular claimant is capable of performing, the Commissioner uses a variety of sources of information, including the DOT, the SSA's own regulatory policies and definitions (found in the Code of Federal Regulations ("CFR")), and testimony from VEs.

"The DOT is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job." *McHerrin v. Astrue*, No. Civil Action No. 09–2035, 2010 WL 3516433, at *3 (E.D. Pa. Aug. 31, 2010) (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). The qualification categories listed by the DOT for each job include the job's Strength level, General Educational Development ("GED") level, and its Specific Vocational Preparation ("SVP") level. *Appendix C*, Dictionary of Occupational Titles, *available at* www.occupationalinfo.org/ appendxc_1.html. Strength level "reflects the estimated overall strength requirement of the job." *Id.* GED measures the "those aspects of education

18

(formal and informal) which are required of the worker for satisfactory job performance." *Id.* GED is broken into three categories: (1) reasoning development, (2) mathematical development, and (3) language development. *Id.* Reasoning levels in the DOT range from level 1 to level 6. *Id.* Important to this case, jobs with a reasoning level of 3 require that an employee be able to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and d]eal with problems involving several concrete variables in or from standardized situations." *Id.*

SVP levels, on the other hand, measure the skill level necessary to perform a particular job. SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). "A skill is knowledge of a work activity that requires the exercise of significant judgment that goes beyond the carrying out of simple job duties." *Id.* SVP levels in the DOT range from level 1 to level 9. *Id.* The DOT skill levels correspond with the second source of information relied on by the Commissioner: the CFR. Section 404.1568 of the CFR classifies occupations into three categories: unskilled, semi-skilled, and skilled. 20 C.F.R. § 404.1568(a)–(c) (2014). Unskilled work is defined as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." *Id.* § 404.1568(a). Unskilled work corresponds to an SVP level of 1–2; semi-skilled work corresponds to an SVP level of 3–4; and skilled work corresponds to an SVP level of 5–9. SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).

The Commissioner can also rely on testimony from a VE to meet its step-five evidentiary burden. 20 C.F.R. § 404.1566(e). VEs are most commonly used to provide

evidence at hearings before ALJs to resolve complex vocational issues. SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). However, a common issue—and the one argued by Zirnsak on appeal—arises when a VE's testimony conflicts with other sources of information relied on by the Commissioner, namely the DOT. As a general rule, occupational evidence provided by a VE should be consistent with the occupational evidence presented in the DOT. *Id.* at *2. To ensure consistency, courts have imposed an obligation on ALJs to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the [DOT]." *Id.* at *1; *Rutherford*, 399 F.3d at 556. Specifically, an ALJ is required to (1) ask, on the record, whether the VE's testimony is consistent with the DOT, (2) "elicit a reasonable explanation" where an inconsistency does appear, and (3) explain in its decision "how the conflict was resolved." *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002). An ALJ's failure to comply with these requirements may warrant remand in a particular case. *Rutherford*, 399 F.3d at 557. However, this Circuit has emphasized that the presence of inconsistencies does not *mandate* remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." *Id.* (citing *Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2004)).

Zirnsak alleges that the VE's testimony at her hearing conflicted with the DOT in two ways. The first inconsistency involves the VE's testimony that Zirnsak was capable of working as an order clerk, charge account clerk, or telephone quotation clerk. Zirnsak argues that the reasoning level required for these three jobs—all three occupations have a GED reasoning level of 3—is inconsistent with the ALJ's

20

finding that Zirnsak is "limited to simple and repetitive tasks involving routine work processes and settings." (Appellant's Br. at 51–52). The second inconsistency involves the VE's testimony that Zirnsak was capable of working as a sedentary subassembler with a sit/stand option. Zirnsak argues that the strength requirements for a subassembler conflict with the ALJ's finding that Zirnsak should be limited to sedentary work. (*Id.* at 54–56). For the following reasons, we find that neither of these inconsistencies warrants remand.

### A.    Reasoning Level Conflict

As a threshold matter, we must first note that the ALJ met his affirmative obligation to inquire about inconsistencies in this case. At the end of the VE's testimony, the ALJ specifically asked: "Is the testimony that you did provide consistent with the information I'd find in the [DOT] and other relevant vocational sources?" (Tr. at 59). The VE responded that her testimony was consistent except for the fact that the DOT does not address a sit/stand option for subassembler positions. (*Id.*). The VE did not note the inconsistencies in strength or reasoning level now argued by Zirnsak on appeal. Importantly, neither Zirnsak nor her attorney "challenged the VE on th[ese] point[s] or otherwise identified any apparent inconsistency between the VE's testimony and the DOT." *Clawson v. Astrue*, Civil Action No. 11–294, 2013 WL 154206, at *6 (W.D. Pa. Jan. 15, 2013).

Because the VE did not identify the reasoning level inconsistency at the hearing, the ALJ did not elicit an explanation for that inconsistency or explain in its decision how the conflict was resolved. *Burns*, 312 F.3d at 127. Therefore, we must determine whether there is substantial

evidence in the record that still supports the ALJ's determination. *Boone*, 353 F.3d at 209. There is a split of authority as to whether an inherent conflict exists between a job requiring level 3 reasoning and a finding that a claimant should be limited to simple, routine tasks and unskilled work. Several courts have held that a finding limiting a claimant to simple, repetitive tasks is inconsistent with a job requiring a reasoning level of 3. *E.g.*, *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005); *McHerrin*, 2010 WL 3516433, at *5. These courts have found that claimants limited to simple, repetitive tasks are better suited for jobs that require level 2 reasoning. *E.g.*, *Hackett*, 395 F.3d at 1176. Further, they have held that an SVP classification of a job as unskilled does not neutralize the conflict between a limitation to simple tasks and a job requiring level 3 reasoning. *McHerrin*, 2010 WL 2516433, at *6 (citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997)).

On the other hand, several courts have found that there is not a "*per se* conflict between a reasoning level 3 job and [a] limitation to simple, routine tasks/unskilled work." *E.g.*, *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007); *Clawson v. Astrue*, Civil Action No. 11–294, 2013 WL 154206, at *6 (W.D. Pa. Jan. 15, 2013); *Simpson v. Astrue,* Civil Action No. 10–2874, 2011 WL 1883124, at *7 (E.D. Pa. May 17, 2011). These courts have focused on whether a failure to inquire about or reconcile a conflict caused any harm to the claimant when determining whether remand is necessary. *Simpson*, 2011 WL 1883124, at *5. These courts have found that any error stemming from an ALJ's failure to ask about a conflict was harmless where the record established that the claimant in question could perform a level 3 reasoning job, despite a

22

limitation to simple work. *Terry*, 580 F.3d at 478; *Renfrow*, 496 F.3d at 921; *Simpson*, 2011 WL 1883124, at *7. These courts have identified certain factors that influenced their reasoning. First, in *Terry*, the Seventh Circuit noted that the claimant in that case "[did] not argue that she [could not] perform these skills, perhaps because the record suggest[ed] she [could]." *Terry*, 580 F.3d at 478. Next, it emphasized that because the claimant did not point out the conflict at trial, she was required to show that the conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Id.* (alteration in original) (quoting *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). Finally, these courts noted that the jobs listed by the VE were only representative examples—not an exhaustive list—of jobs that the claimant was capable of performing. *Simpson*, 2011 WL 1883124, at *8 (citing *Rutherford*, 399 F.3d at 557).

The review of the aforementioned cases demonstrates that there is no bright-line rule stating whether there is a *per se* conflict between a job that requires level 3 reasoning and a finding that a claimant should be limited to simple and routine work. Without controlling precedent on this issue, this Court finds that the decisions in the *Terry* and *Simpson* cases are most applicable to the facts of Zirnsak's case. First, as in *Terry* and *Simpson*, Zirnsak does not seriously argue that she is incapable of performing the jobs—order clerk, charge account clerk, or telephone quotation clerk—recommended by the VE.[6] The record establishes that Zirnsak could perform

---

[6] Instead, she dedicates only one line of her brief to this issue, stating that: "The record does not indicate any explanation as to how a hypothetical claimant limited to only simple, repetitive, routine work could perform the

23

these jobs. Zirnsak completed tenth grade and testified that she received her GED or further education. (Tr. at 33). Zirnsak also had previous experience working as both a clerk and a bookkeeper. (*Id.* at 34). Further, the "objective medical record [was deemed] unsupportive of the claimant's allegations of disabling mental impairments." (*Id.* at 18). At numerous evaluations during the relevant period, Zirnsak was noted to be "oriented," "calm," and "psychologically appropriate." (*Id.*). She received only conservative treatment—primarily medication—during the relevant period. (*Id.* at 19). Finally, Zirnsak's own account of her daily activities was "relatively full and independent." (*Id.*).

Second, as in *Terry* and *Simpson*, Zirnsak's counsel did not identify any inconsistencies between the VE's testimony and the DOT at her hearing. (Tr. at 59). In fact, Zirnsak's counsel did not question the VE regarding inconsistencies at all. (*Id.*). Finally, as in *Simpson*, the occupations listed by the VE were only "a couple examples" of jobs available to Zirnsak. (*Id.* at 57); *Simpson*, 2011 WL 1883124, at *8 (citing *Rutherford*, 399 F.3d at 557). Accordingly, the combination of these factors compels our finding that "any conflict [was] not so obvious that the ALJ should have pursued the question." *Simpson*, 2011 WL 1883124, at *7 (alteration in original) (quoting *Terry*, 580 F.3d at 476).

---

occupations of order clerk, charge account clerk, and telephone quote clerk, as described by the DOT." (Appellant's Br. at 53–54).

24

## B.	*Strength Level Conflict*

Zirnsak also argues that the strength requirements for a subassembler conflict with the ALJ's finding that Zirnsak should be limited to sedentary work. The SSA and DOT both assign "physical exertion requirements" to each job available in the national economy. *See* 20 C.F.R. § 404.1567 (2014) ("To determine the physical exertion requirements of work in the national economy, we classify jobs as sedentary, light, medium, heavy, and very heavy. These terms have the same meaning as they have in the [DOT]."). Sedentary work requires the lowest level of physical exertion. *Id.* The ALJ found that Zirnsak was only capable of performing sedentary work. (*See* Tr. at 16 ("After careful consideration of the entire record, I find that . . . the claimant had the [RFC] to perform sedentary work . . . except she would have been limited to sedentary work that did not require the operation of foot controls or the operation of dangerous machinery.")). At Zirnsak's hearing, the VE testified that Zirnsak could work as a subassembler. (*Id.* at 57–58). The VE characterized this job as "sedentary." (*Id.* at 57). However, the DOT has assigned the job of subassembler a physical exertion level of "light." Thus, there is an inconsistency between the VE's and the DOT's characterization of the physical exertion level required for subassembler positions. This inconsistency was identified at the hearing. (*Id.* at 59).

Therefore, our inquiry focuses on whether the ALJ (1) "elicit[ed] a reasonable explanation" for this inconsistency and (2) explained in his decision "how the conflict was resolved." *Burns*, 312 F.3d at 127. Here, the VE did provide an explanation for the inconsistency. She noted that the subassembler job could be performed with a sit/stand option.

25

(Tr. at 58). However, she noted that the DOT does not discuss or address this option. (*Id.* at 59). She explained that she was aware of subassembler jobs with a sit/stand option from her "work in the field." (*Id.*). The ALJ relied on this explanation to resolve the conflict. (*Id.* at 21). However, neither the ALJ nor the VE explained how a sit/stand option would transform a subassembler job from a job requiring "light" exertion level to a "sedentary" job. Thus, we cannot say that the ALJ elicited a reasonable explanation for this inconsistency or resolved this conflict. However, the ALJ's failure to comply with the requirements of SSR 00-4p in this instance is not fatal. Substantial evidence supports Zirnsak's ability to perform three other jobs widely available in the national economy: order clerk, food and beverage (35,000 jobs nationally); charge account clerk (40,000 jobs nationally); and telephone clerk (80,000 jobs nationally). (Tr. at 57). Therefore, the erroneous inclusion of the subassembler position as an example of a job available to Zirnsak did not cause her any harm. Accordingly, we find that the existence of these minor conflicts does not warrant remand of the ALJ's decision.

## III.   CONCLUSION

For the foregoing reasons, we will affirm.

26