NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3142
_____

PARIS MARCELLE MYERS,
Appellant

v.

COMMISSIONER OF SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-14-cv-03243)
District Judge:  Honorable Gene E.K. Pratter
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 6, 2016

Before:  FISHER[*], KRAUSE and MELLOY[**], *Circuit Judges.*

(Filed: April 11, 2017)
_____

OPINION[***]
_____

---

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

[**] Honorable Michael J. Melloy, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

[***] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

MELLOY, *Circuit Judge*.

Paris Myers applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, asserting she was disabled due to mental impairments. An ALJ denied her application, concluding she suffered from impairments that did not match or equal impairments listed in Social Security regulations. The ALJ also determined she retained the residual functional capacity to perform her past work as an unskilled laundry worker and thus was not disabled. The Appeals Council denied her request for review, and the District Court affirmed. Because the agency decision enjoys the support of substantial evidence, we will affirm the judgment of the District Court.

I.

Myers, born in 1985, filed a claim for disability benefits, eventually alleging an amended disability onset date of November 2009. The administrative record includes treatment records from episodes of inpatient treatment. It also includes treatment notes, interrogatory responses, and a medical source statement from a psychiatrist who treated Myers over the course of two years. Several examining and non-examining consulting psychologists also submitted reports. Statements Myers made to these sources and in her application materials and testimony before the ALJ include often-inconsistent descriptions of Myers's abilities, activities, and limitations.

Myers suffers from sub-average intelligence and a learning disability, and she has difficulty managing stress and dealing with other people. In addition, she reports depression, suicidal impulses, and hearing voices encouraging her to do harm to herself and others. She has a history of treatment related to these issues and generally has responded positively to therapy and conservative medical treatment. She graduated high school taking special education classes. Myers earned income from various jobs over or only slightly below the income level for substantial gainful employment when she was 19–20 and 22–24. Most recently, she worked for approximately 1½ years in a hotel's laundry, and she reports losing that job because she called-in sick too frequently. She reports that she lost earlier jobs, including working food preparation and as a cashier at fast food restaurants, because she became frustrated with customers and lashed out at them.

Based upon this evidence, the ALJ applied the five-step sequential analysis of 20 C.F.R. § 404.1520(a)(4), to assess her entitlement to Social Security benefits. The ALJ found Myers "not entirely credible" in reference to her self-reported limitations and her description of the persistence and severity of her symptoms. At step one, the ALJ determined Myers had not engaged in substantial gainful activity since November 2009. *See* 20 C.F.R. § 404.1520(b). At step two, the ALJ determined Myers suffered "severe" impairments in the form of mild mental retardation, learning disorder, schizophrenia, and affective disorders. *See id.* §§ 404.1520(c) and 416.920(c). At step three, however, the

3

ALJ determined Myers did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. At step four, the ALJ examined evidence of Myers's abilities and activities and determined she retained the functional capacity to perform work at all exertional levels but limited to unskilled, repetitive work with routine tasks in a low stress environment with no public interaction and limited interaction with bosses and coworkers. *See id.* §§ 404.1520(e) and 416.920(e). Finally, the ALJ determined Myers was not disabled because she was capable of performing her past relevant work as a laundry worker. *See id.* §§ 404.1520(f) and 416.920(f).

On appeal, Myers argues the ALJ misconstrued the step-three standard for assessing whether she satisfied the requirements of Listing 12.05C, which is used to determine whether the claimant has an intellectual disability. She also argues the ALJ reached a conclusion not supported by substantial evidence when assessing her functional abilities and limitations. Finally, she argues the ALJ erred by not giving controlling weight to the opinion of her treating psychiatrist who found that she met the requirements for Listing 12.04 (Affective Disorders). We address these arguments in turn.

II.

We review the ALJ's factual findings for substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as

4

adequate to support a conclusion.'" *Zirnsak*, 777 F.3d at 610 (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id.* (quoting *Rutherford*, 399 F.3d at 552). If the ALJ did not misapply the law, we do not substitute our own judgment for that of the fact-finder; if substantial evidence supports the ALJ's decision, we must affirm even if we would have reached a different conclusion in the first instance. *Rutherford*, 399 F.3d at 552. We review the district court's judgment de novo. *Zirnsak*, 777 F.3d at 611.

## A. Listing 12.05

Step three of the sequential analysis requires a comparison of an applicant's condition to an administrative list of recognized impairments. "If the impairment is equivalent to a listed impairment, then [the claimant] is *per se* disabled and no further analysis is necessary." *Burnett v. Comm'r Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). If an applicant does not meet or medically equal one of the listed impairments, the sequential analysis continues to steps four and five: an examination of the applicant's functional abilities and limitations and an assessment of whether she can perform her past work or other work that exists in the national economy. In short, the listed impairments of step three are defined at a sufficient degree of severity to permit the agency to skip steps four and five.

5

The ALJ addressed several mental-health-related listings below, but Myers's argument on appeal focuses primarily on 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.05C.[1] This listing contains three requirements: a threshold deficit level of "general intellectual functioning" ("[a] valid verbal, performance, or full scale IQ of 60 through 70"); another "mental impairment imposing an additional and significant work-related limitation of function"; and "onset of the impairment before age 22." *Id.* Myers argues specifically that the ALJ erred by demanding evidence in the form of a qualifying IQ score obtained prior to age 22, rather than merely demanding evidence of onset prior to age 22.

---

[1] The listing provides:

> Mental Retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. As noted above, this listing was amended in 2013 to substitute the label "Intellectual Disability." 78 Fed. Reg. 46499–01 (Aug. 1, 2013). The agency further amended the listing effective January 17, 2017, to substitute the label "Intellectual Disorder" to avoid confusing use of the term "Disability." 81 Fed. Reg. 66138, 66150 (Sept. 26, 2016). The amendments published September 26, 2016, also reorganize Listing 12.05 to eliminate 12.05C and incorporate its requirements into other subsections of Listing 12.05. *Id.* at 66150.

Myers's argument rests generally on an accurate description of the listing's requirements. An applicant must demonstrate both onset prior to age 22 and a qualifying level of deficit in intellectual functioning. The requirements, however, do not specifically demand that the applicant produce a valid, qualifying IQ score obtained prior to the applicant reaching age 22. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("We did not intend . . . listing 12.05 to require intelligence testing . . . during the developmental period. We have always interpreted [the] word [manifested] to include the common clinical practice of inferring a diagnosis . . . when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the end of the developmental period." (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000))). Simply put, onset prior to age 22 may be demonstrated through other evidence, whether dating from the claimant's developmental period or later, so long as that evidence supports an inference of onset prior to age 22. *Id.*

It is not enough, however, that Myers's argument rests generally on an accurate description of the requirements because we conclude the ALJ did not run afoul of the requirements. The ALJ did not conduct a simplistic analysis and artificially impose a requirement that a valid and qualifying IQ score *must* exist prior to age 22. Rather, the ALJ noted Myers's various scores and other evidence, concluding that evidence of onset prior to age 22 was lacking. Not surprisingly, the ALJ noted the different ages at which

7

Myers took IQ tests. The ALJ also commented upon the tests and other evidence, described Myers's abilities and activities as inconsistent with the listings' requirements, and explained her view of the evidence.

The evidence cited by the ALJ showed that, when Myers received inpatient psychiatric inpatient treatment at age 14, her diagnosis upon admission stated she was "significantly mentally retarded." Mid-treatment, however, physicians labeled her impairment "moderate." And upon discharge, her final diagnosis described her condition as "learning disability, mild mental retardation." The ALJ specifically noted that no intellectual testing was performed at that time to establish these diagnoses; rather, discharge instructions recommended that Myers undergo IQ testing at her school. The ALJ also observed that Myers's school did not subsequently conduct any IQ testing and "the claimant was never treated as 'mentally retarded' in the educational system." Rather, "the claimant was enrolled in special education and had some poor performance in school with below basic testing, but the claimant graduated high school."

Then, in 2006 at age 21, Myers took an IQ test, scoring 78–89. And later, at age 27, Myers again took an IQ test, scoring 65–79. The ALJ noted that the examiner administering the test when Myers was 27 stated the results were considered "generally" valid. The ALJ also noted, however, that the examiner stated Myers "was cooperative with testing, but easily distracted and easily frustrated. Her attention and concentration were variable, and diligence and perseverance were poor." The ALJ reviewed this

8

evidence against the backdrop of a qualitative description of Myers's activities and limitations, including the specific finding that Myers did not credibly report the severity and persistence of her limitations.

We conclude the ALJ sufficiently explained her conclusions and did not erroneously demand a qualifying IQ score from Myers's developmental years. Rather, the ALJ permissibly discounted the shifting diagnoses at age 14 and the IQ scores at age 27 for reasons supported by the record. Given this analysis, we conclude the ALJ reached a permissible factual conclusion when she determined that Myers failed to satisfy the requirements for establishing an intellectual disability under Listing 12.05C. *See Markle*, 324 F.3d at 187 ("[A]n ALJ may reject scores that are inconsistent with the record."). To the extent Myers advocates for a bright-line rule that would require an ALJ to wholly discount actual IQ scores obtained prior to age 22 merely because later-obtained IQ scores from the post-developmental period were lower, we reject her argument. The fact that the requirements do not demand a qualifying IQ score from before age 22 does not mean higher scores from that period become immaterial.

### B. Additional Arguments

Myers's remaining arguments rest upon factual disputes concerning permissible views of the record, weights the ALJ accorded different experts' opinions, and the sufficiency of the ALJ's discussion of the record. We conclude there were sufficient inconsistencies in Myers's self-reports of her activities and limitations to permit the ALJ

9

to discount her testimony as not entirely credible.  For example, the ALJ stated Myers "reported limited activities of daily living, [but] the record shows that she plays videogames, spends time on the internet, dates frequently, and independently cleans, does laundry, shops, cooks, manages money, and cares for personal hygiene."  Focusing on these conclusions, Myers cites several portions of the record seemingly at odds with these statements.  Myers's own descriptions, as set forth in her self-completed Social Security Administration Adult Function Report and as reported to her therapist, however, support the ALJ's conclusions.

At the end of the day, the ALJ accepted many of Myers's claimed limitations albeit at a lesser degree of severity.  The ALJ included these limitations in a residual functional capacity determination consistent with repetitive unskilled work in a low stress environment with limited interaction with bosses or coworkers and without public interaction.  This conclusion was consistent with opinions offered by several non-treating consulting experts: Roslyn Wolberg, Psy. D., who examined Myers in 2006; state medical expert James Vizza, Psy. D., who reviewed records and completed a residual functional capacity assessment in 2011; Lori Hart, Ph.D., who examined Myers in 2010; and John Rohar, Ph.D., who reviewed records and completed a Psychiatric Review Technique in 2010.

Myers takes particular issue with the ALJ's treatment of an opinion from a non-treating psychologist, Dr. Penny Levin, who examined Myers in 2012.  Dr. Levin ranked

Myers's limitations in several work-related areas as "slight" or "moderate" in most respects but as "marked" in reference to Myers's ability to interact with the public, supervisors, or co-workers. The ALJ then discounted the "marked" assessments by Dr. Levin because Dr. Levin had not defined the term "marked" in her report. Myers argues this was error because the term "marked" is an administratively defined level of impairment as would have been known by Dr. Levin. *See* 20 C.F.R. § 404, Subpart P, App. 1, 12.00(C). Even assuming Myers is correct as to what Dr. Levin would have known, the ALJ was not required to accept Dr. Levin's conclusions wholesale. And in any event, the ALJ assessed a residual functional capacity that limited interaction with the public, supervisors, and co-workers.

Finally, Myers argues the ALJ impermissibly discounted her treating psychiatrist, Dr. Jiwesh Jha. The ALJ stated:

> Lastly, the record contains interrogatories completed by the claimant's treating psychiatrist and therapist. According to the interrogatories, the claimant meets the criteria of listing 12.04 for Affective disorders and she has marked limitations in sustained persistence and concentration, social interaction, and understanding and memory. Although I considered this medical source statement as the opinion of a treating and examining medical source, I do not give the findings controlling weight because they are not supported by accepted clinical and diagnostic techniques. Additionally, the conclusions are inconsistent with other substantial evidence of record, including the medical opinions of State agency medical consultants and consultative examiners finding the claimant capable of performing a range of unskilled work. Further, the findings are inconsistent with treatment records showing improvements with medication, and the claimant's activities of daily living including using public transportation, going to the pharmacy and paying with her own Access card, using a cell

11

phone, getting along with and socializing with her housemates, and caring independently for personal needs. Lastly, similar to the mental health treatment records showing improvements with medication compliance, the medical source statement notes that the claimant's symptoms can be managed with medication and outpatient therapy.

A treating physician's opinion is entitled to great weight when there is a substantial longitudinal treatment period, the opinion is well-explained and well-supported, and the opinion is consistent with other evidence. *Brownawell v. Comm'r Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) ("An ALJ should give treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." (quotation marks and citation omitted)). "While contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright, such an opinion may be afforded 'more or less weight depending upon the extent to which supporting explanations are provided.'" *Id.* (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999))). As such, if "the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quotation marks and citation omitted).

We conclude the ALJ permissibly interpreted the interrogatories and treatment notes from Dr. Jha. The interrogatories conclude Myers satisfies Listing 12.04, but provide no explanation, merely stating she meets "all" requirements. Further, as noted by

12

the ALJ, the treatment itself was conservative, medication lessened symptoms, and treatment notes do not support the severity indicated in the interrogatory responses. The ALJ was not required to accept Dr. Jha's unadorned conclusions that were inconsistent with the balance of his treatment notes and the other experts' views.

We will affirm the judgment of the district court.